## VIRGIL GALLAHER V. THE STATE.

### No. 1773.   Decided March 15, 1899.

**1.   Change of Venue—Prejudice Against Defendant.**

It has been held that prejudice and prejudgment of defendant's case mean one and the same thing, and that such a prejudgment of the case, if it showed that defendant could not get a fair and impartial trial in the county, would authorize a change of venue.  However this may be, if, in addition to such prejudgment, the atrocity of the crime is shown to have engendered a personal ill will or prejudice against the accused, it is error to refuse to change the venue.

**2.   Juror—Qualification of—Fixed Opinion—Newspaper Accounts.**

Where a juror has a fixed opinion as to defendant's guilt, formed from newspaper accounts detailing all the evidence, including defendant's confession, which opinion had been strengthened by hearing the evidence adduced on the motion to change the venue; and he states that defendant would have to prove himself innocent before he would acquit, and that it would require a great deal of evidence to change his mind; Held, he was incompetent and disqualified, notwithstanding his statement that he was nevertheless in condition of mind to go into the jury box and try the case according to the evidence adduced on the trial without weighing the opinion he then entertained, and could give the defendant the benefit of the presumption of innocence until the proof satisfied him he was guilty.

**3.   Confession.**

Before a confession is admissible in evidence under our statute, Code of Criminal Procedure, article 790, the burden is upon the prosecution to show that it is a voluntary statement of the accused; and, to determine whether it was voluntary or not, the court will not alone look to the language used by the accused, but to all the surrounding circumstances also, and scrutinize them closely in connection with the inducement leading to the confession.

**4.   Same.**

When the circumstances attendant upon the confession show such an environment of the accused as suggest at least that the confession was not the free and voluntary act of the accused, but was superinduced by the acts and conduct of the officers determined to make him confess, and who unquestionably employed means not in keeping with the statute on the subject, the confession is not admissible in evidence.

**5.   Same—Charge of Court.**

If any controversy is made on the trial as to the admission of a confession, on the ground that it was not freely and voluntarily made, the court should give the jury an appropriate charge on the subject.

APPEAL from the Criminal District Court of Galveston.   Tried below before Hon. E. D. CAVIN.

Appeal from a conviction for murder in the first degree; penalty, death.

The indictment charged appellant with the murder of Kate H. Gallaher, on the 15th day of August, 1897, by cutting her with some sharp instrument, to the grand jurors unknown.   Kate H. Gallaher, the murdered woman, was the mother of appellant.

The record is quite voluminous, but the opinion of the court, as found below, states concisely but sufficiently the leading facts in the case.

*D. D. McDonald, Newton J. Skinner,* and *Arthur J. Keetch,* for appellant.—The court erred in overruling defendant's motion for change

of venue, and, from the later developments on the trial, should have granted a new trial for the reason that the change of venue was not granted. Code Crim. Proc., art. 615; Davis v. State, 19 Texas Crim. App., 201; Carr v. State, 19 Texas Crim. App., 635; Winkfield v. State, 41 Texas, 148; Walker v. State, 42 Texas, 360; Buford v. State, 43 Texas, 419; Anschicks v. State, 45 Texas, 148.

The court erred in overruling defendant's challenge for cause to juror J. S. Rogers when his examination developed the fact that he was not a fair and impartial juror, and defendant's peremptory challenges were exhausted. It was also error to refuse to grant a new trial, the motion for which was based in part upon the unfitness of juror Rogers, as shown by his voir dire and the new trial proceedings. Juror J. S. Rogers was the twelfth and final juror selected, but the first one forced upon the defendant after his challenge for cause was overruled and his peremptory challenges were all exhausted. Not being able to agree upon a bill of exceptions to this ruling of the trial judge, the stenographic report of Juror Rogers' examination was incorporated in the record. The perusal of this examination must raise in the minds of the court at least a very grave doubt as to the qualification and fitness of said juror, and defendant in a capital case should have been given the benefit of such doubts, especially after his peremptory challenges were exhausted. That defendant's challenge for cause to juror Rogers was well taken and should have been allowed would seem probable from his voir dire alone, but certain beyond any doubt when viewed in the light of his oral cross-examination upon the new trial hearing and the affidavit of juror Powers. In this affidavit and upon the witness stand juror Powers swears that juror Rogers tried in many ways and from the moment of entering the jury room to influence the other jurors against the defendant, even going so far as to relate the most startling new testimony that defendant had raped his mother and then killed her to conceal his crime, saying further, that Dr. Warfield, the county physician, confirmed such reports as true. Juror Rogers, upon cross-examination, refused to deny that he mentioned this terrible report during the deliberations of the jury room and in the presence and hearing of juror Powers, but attempted to justify such actions by stating that the story of rape and outrage was made the subject of examination by both the trial judge and the defendant's counsel when questioning him on his voir dire, but the verbatim report of that examination in bill of exception number 9 clearly shows that no such questions were asked of juror Rogers by either court or counsel.

The court erred in permitting Chief of Police Jones to testify over defendant's objection to the so-called confession made to him by this defendant, for upon examining into the admissibility of this confession during the absence of the jury from the court room it was made to clearly appear from witness Jones that though the defendant had been duly and legally warned before making the statements introduced as his confession the same were not freely and voluntarily made without

compulsion or persuasion, as the law requires such confession to be made to render it admissible as evidence against the defendant.

The court erred in permitting the so-called confessions made to Chief Jones and Deputy Chief Amundsen by defendant while under arrest to go to the jury, because, though defendant seems to have been legally cautioned and warned, the evidence shows that such confession was not "freely and voluntarily made without compulsion and persuasion," and a new trial should have been granted on this ground alone. Code Crim. Proc., arts. 789, 790; Cain v. State, 18 Texas, 387; Greer v. State, 31 Texas, 129; Barnes v. State, 36 Texas, 357; Carter v. State, 37 Texas, 362; Searcy v. State, 13 S. W. Rep., 782; Clayton v. State, 21 S. W. Rep., 255; Willis v. State, 44 S. W. Rep., 826; Amendments to U. S. Const., art. 5; 1 Greenl. Ev., 15 ed., sec. 219; Whart. Crim. Ev., 9 ed., sec. 872; 1 Bish. New Crim. Proc., sec. 1217; Sparf v. United States (1895), 156 U. S., 51-55; Bramm v. United States, Sup. Ct. Rep., No. 340, October term, 1897; Hopt v. Utah, 110 U. S., 574.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

The evidence for the State showed that appellant was the son of deceased, Mrs. Kate H. Gallaher, and that at the time of the homicide he and his mother were living together in a house in Galveston, alone; that on Saturday night, August 15, 1897, appellant entered deceased's room, and cut her throat with a razor. The corpse of deceased remained in the building all the next day, which was Sunday. On the following night appellant attempted to burn the house, and after several unsuccessful attempts, at length succeeded in setting it on fire. Before the fire had made great headway, it was discovered and extinguished. The remains were found partially burned, but not consumed, and the evidence of death by violence was apparent. The motive imputed was robbery. The State's case depends on circumstantial evidence, in connection with the confessions of appellant. On the trial appellant relied on a plea of not guilty, and he introduced some evidence tending to show his insanity or mental aberration at the time of the alleged homicide. Appellant also made a motion for a change of venue, and, as a disposition of this case depends greatly on the action of the court in regard to said motion for change of venue, we will summarize from the record enough to show the questions raised, and to bring in review the action of the court.

Motion was made by appellant to change the venue of said cause on the ground "that there exists in Galveston County so great a prejudice against him that he can not obtain a fair and impartial trial." This was sworn to by appellant, and was supported by the following compurgators, to wit: William Slater, J. R. Snedeker, E. C. Green, M. L. Eggers, R. P. Sargent, L. L. Cretin, John A. Harrington, C. A.

Horseley, and Newton J. Skinner. This motion was controverted by the State on the affidavits of J. K. P. Gillespie, district attorney; Henry Thomas, sheriff, and W. C. Jones, chief of police of said Galveston City. Said affiants stated "that they were acquainted, or had been made acquainted, by inquiry from every available source, with said compurgators, and are cognizant of their means of knowledge, and all the matters stated by them, and each of them, in their said affidavits, and that their said means of knowledge is not sufficient to support and justify the statements contained in their said affidavits; that said Galveston County is large in area, a part of which is on the island of Galveston, and a large part on the mainland, and containing a large population, engaged in various numbers and kinds of occupations and business, and affiants state that it is impossible from the conditions existing that said compurgators could have the knowledge stated in their affidavits; and further state that from a long and intimate acquaintance obtained from official and other sources, of the qualified jurors in Galveston County, there is no such prejudice against Virgil Gallaher as that he can not obtain a fair and impartial trial in said Galveston County, and that the statements so made by said compurgators were ignorantly made, and are in fact untrue."

On the issue thus joined appellant introduced nineteen witnesses, including, besides the compurgators named above, the following additional witnesses: W. C. Williams, Henry Bee, F. G. King, Frank Corbin, Lawrence Bacigaloupi, H. Rakel, Thomas P. Duffy, F. G. Leaverenz, J. T. Morris, and F. Freund. Most of these witnesses had lived a number of years in Galveston County, some as long as thirty-two years, and the most, if not all, resided in the city of Galveston, and were well acquainted in said city, pursuing various occupations,—some butchers, some salesmen, contractors, merchants, saloon men, newspaper men, tailors, etc. The examination of said witnesses took a wide range, but appears to have been confined to three salient points: (1) The publication of an account of said homicide in the Galveston Daily News and in the Evening Tribune. The circulation of these papers was shown to be large in said county, and to have been greatly increased during the three or four days succeeding the homicide. The normal daily circulation of the Galveston News was from 3400 to 3700, and on the day after the homicide was discovered 1200 to 1500 extras were issued. The normal daily circulation of the Evening Tribune was about the same as the News, and on the 16th of August, the day of the discovery of the homicide, and for two days thereafter, it was greatly increased, the extras amounting to 2500 for the three days. The confessions of appellant and an account of the homicide appear to have been published in said papers. (2) It was also shown that there was exhibited on the sidewalk, in one of the most public streets of the city of Galveston, in the show case of a leading photographer, photographs of the house and various scenes connected with the homicide. Said pictures were designated by writing, showing what they were, such as

"the room where Gallaher killed his mother," etc. These pictures were on public exhibition about a week, and it was shown that a large number of people visited said place, and viewed and discussed said pictures. Said photographs were finally removed from the street at the instance of the sheriff. (3) It was also shown that other defamatory statements were circulated in regard to appellant, in connection with said murder, to wit, that he had outraged his mother before killing her; also other defamatory statements as to other matters of a criminal character charged against him.

We quote from the testimony of some of said witnesses, as presenting a fair sample of what appellant's testimony was in this regard, the record being too voluminous to quote all:

William Slater testified: That he was a sewing machine agent and had lived in Galveston about seventeen years. That he made an affidavit in this case. That he had formed the opinion from the animus expressed by the people at large. "During the last four days since this case has been courtroom talk. I have heard remarks every day in the courtroom and out of the courtroom; have heard remarks here in the lobby. One of the remarks was that, 'If I was on the jury, I would hang the defendant.' Another remark struck me very forcibly: 'I would like to see that bastard hanged.' These remarks were made by men. I have heard other remarks made the substance of which is something like this: 'If I had my way with him, I would lynch him;' or, 'If I had my way with him, he ought to be burned;' or, 'If he was only up in my county where I used to live, he would never have a trial at all.' They were not made upon my solicitation. They have been made on many occasions. * * * I have not heard any opinion concerning his innocence or concerning his ability to get a fair trial." On cross-examination he stated that he was a white man, and boarded at Annie Westhall's, a colored woman; that he was a sewing machine agent; that his business brought him in contact with both men and women; that he did not know the number of jurors he had talked with; that he had talked with as many as ten qualified jurors, but could not name any of them.

John A. Harrington testified that he was a lawyer, and had formerly been attorney for appellant. That he knew a great many people in Galveston. That he had made it his business, while acting as attorney for defendant, to find out the feeling towards defendant. He stated that he had heard expressions from various persons highly disparaging towards appellant, not only about the case itself, but as to other matters. Among others, that it was reported that one of the reasons that the defendant committed the deed was that he had gone to the house after having left the dive where he had been carousing, and, under the influence of excitement and evil passions engendered at that place, he made a criminal assault upon his mother. There were other remarks, but they were much less heinous than that. Witness stated that he had talked to as many as 100 and perhaps as many as

500, qualified jurors. That he only knew, in a general way, about the mainland and the qualified jurors there. That it was possible to get twelve qualified jurors in the county, if all the time was devoted to that object. That it would be easier to obtain a fair trial anywhere else. That details and statements, made through the press and otherwise, would prejudice the case, as also the photographer's pictures which were exhibited on the street. That he finally got the sheriff to go there, and direct those pictures to be taken down. That these things were calculated to create a feeling and excitement in the community that was to the disadvantage of defendant.

F. G. King testified that he had resided in Galveston about six years, and was a tailor by trade. Had heard a great many people express their opinion in regard to the prisoner's guilt or innocence. The majority of them was that he ought to be executed. That he had probably heard in the neighborhood of fifty express that opinion. The universal opinion of the majority was that he ought to be executed.

C. A. Horseley testified that he was in the hardware business, and had resided in Galveston twenty-seven years. That he had read the Tribune and News about this case when it happened. That he had heard other remarks in connection with the case, but, as he was on the grand jury that found the indictment, it might not be right for him to tell them. That at the time the crime was committed he did not hear the same class of stories that he heard afterwards. The substance was that he had committed an outrage on his mother. "It was my impression that I have heard it from a considerable number of people. I have heard other stories. The circumstances in which the body was found was not at all in compliance with the statements in the paper and making corroborative evidence as to the truth of the stories flying around." That he saw the photographs on exhibition in front of Morris'. That he heard expressions at that time prejudicial to defendant. That, while he was looking at them, Mr. Morris said he must take that down, and he asked him, "Why?" He said the sheriff, Mr. Thomas, had asked him to take them down, because it was about to cause a prejudice against the prisoner, but that the chief of police did not care whether he took them down or not. That he never heard any one express an opinion about appellant being innocent. That he made the affidavit simply to see fair play. That he had said several times, in spite of the evidence published in the newspaper and in spite of the evidence heard before the grand jury, that it would be very hard to get a jury. That it was impossible to get a man upon the jury but what would be influenced by information heard on the outside. That "it was impossible but that some of the jury would say that they knew so and so, and stories will influence juries. I think the rumors I have heard will cause prejudice fully as much as the newspaper reports."

Thomas P. Duffy stated that he had lived in Galveston twenty-seven or twenty-eight years. That he had been quarantine inspector and bailiff for the last five months. That the expressions he heard were

as to defendant's guilt. That he had heard rumors which, if true, would be greatly against appellant, other than that he was charged with murder. They were that he had committed an outrage upon the deceased, his mother. That he had heard a number of expressions,— did not know how many. People would engage in conversation about defendant, as to what the papers had to say. Saw the pictures exhibited on the sidewalk. He said that, notwithstanding the rumors and talk, he thought appellant could get a fair and impartial trial here. That he thought they could get twelve men out of 9000 who could fairly try the case.

A number of other witnesses stated that they had heard it reported that appellant had outraged his mother, and stated that the expressions they had heard were prejudicial towards defendant; but a number of them stated that they thought appellant might get a fair trial in Galveston County.

E. C. Green testified that he was a resident of Galveston County, and a contractor and builder. That he had talked with a number of persons on the subject of defendant and his crime. That every one he had talked to appeared to think he was guilty and referred to his confession. That he had heard several punishments suggested. That he hardly knew the worst. That witness had heard some persons say that he ought to be burned at the stake, possibly on one or two occasions. That he had heard the other rumor, that he had ravished his mother. From what he had heard, in his opinion, it would hardly be possible to get twelve fair and impartial men to try the case.

On the other hand, W. C. Jones, for the State, testified that he was chief of police of the city of Galveston. Had lived in that community since 1852, and knew a great many people in the county. That he did not think the gentlemen who made the affidavits had the means of knowledge as to the statements they had sworn to. That, from personal knowledge of the community and the people, the matters stated in the affidavits were not true. That, from his knowledge of the community, the defendant could get a fair and impartial trial. That he thought most of the persons who had appeared upon the stand and made affidavits were credible persons, and that they testified as to what they honestly believed to be true, but they did not have the means of knowledge necessary to state the facts. That he did not swear that the defendant could get a fair and impartial trial here. That he was a witness in the case and was before the grand jury. That he could not tell how many of the venire lived outside of the city of Galveston. That at one time he was very well acquainted with the people in the county outside of the city, but not now. This witness stated that he had heard the rumor that appellant had outraged his mother. That he attached no importance to it. That he knew defendant committed a burglary on one occasion. That he saw the articles, and returned them to the owner on the order of Gallaher. That he had not heard the talk that he had outraged other women in the town. That he had

heard the expression that there was no punishment too great for appellant. That he had made that statement himself. That he had made it upon appellant's own statement to him. That he may have repeated that to other people in his office; in fact, there was another person there at the same time and heard it. . He stated that he firmly believed that appellant could have a fair and impartial trial, and that was his opinion. Witness stated that Mr. Morris came to him in regard to taking the pictures down and wanted to know whether he would force him to take the pictures down. That he told him he did not think it was within his authority.

Sheriff Thomas testified substantially, that the men who made the affidavits and testified were credible persons; but he did not think they were sufficiently posted about the sentiment in the community to make the affidavits. He could not say whether their opportunities had been better to know what the people thought about it than his. The special venire list was read over to this witness, which was composed of 150 names. He stated that all of said venire lived in the city of Galveston, except the following: McLean lived down the island some six or seven miles; W. H. Aldredge lived about a mile outside of the city limits, down the island; Joe Aikens lived at Hitchcock, on the mainland; C. A. Ratisseau lived down the island. That when they summoned talesmen they usually summoned them from the city; never had occasion to summon them from anywhere else. Witness stated that he only expressed his opinion founded upon information when he said a fair and impartial trial could be obtained in Galveston County. There are 1500 to 2000 voters outside of the city, on the mainland.

Gillaspie, the district attorney, stated that he thought the defendant could get a fair and impartial trial in Galveston County, and that there was no such prejudice against him as would preclude that. That he believed the compurgators who made the affidavits did not possess the means of knowledge of the facts stated. That he believed persons had expressed themselves more freely to him on the subject on account of his official position than otherwise. That since the commission of said offense he had spent a whole term of the court in the county, and a portion of the present term, some five or six weeks in all out of six months. That he had formed his opinion during the six weeks he had spent in Galveston out of the five months since the commission of the offense. That he had not heard a great many people express their opinion as to appellant's guilt or innocence. Some expressed themselves adversely, and a number had expressed themselves uniformly that he could get a fair and impartial trial in the county. · He stated that the only rumor he had heard circulated against appellant was that he had filched money from his mother.

The court, after hearing the testimony pro and con on the motion for change of venue, overruled the same, and appellant reserved his bill of exceptions.

In Randle v. State, 34 Texas Criminal Reports, 43, this court laid down the doctrine that prejudice and prejudgment mean one and the same thing, and that, if it was shown in the county that there was such prejudgment of the case as that appellant could not obtain a fair and impartial trial, the venue should be changed. And this opinion was adhered to and followed by a majority of the court in Meyers v. State, 39 Texas Criminal Reports, 500. The writer of this opinion dissented from the views entertained by a majority of the court, but in that connection stated "that a case may occur of such startling atrocity as not only to create the formation of an opinion in regard to the guilt or innocence of the party accused of crime, but also to engender a personal prejudice or animosity against such person; that is, the case itself may be so horrible as to engender a personal prejudice against the person accused of perpetrating it." It occurs to us that this case certainly comes within the modified view of the principle laid down in the Randle Case, as above indicated. The crime here alleged against appellant was of a most atrocious character; that is, that he not only murdered a loving mother, who was kind and indulgent to him, by cutting her throat with a razor, while she was asleep, for the purpose of robbery, but that he afterwards undertook to destroy all vestige of his crime by cremating her body. This occurred in the city of Galveston, where a great majority of the people who live in the county of Galveston reside. Not only so, but it was shown that the Galveston News, one of the great daily journals of the State, is published in that city; that it contained an account of the circumstances connected with the homicide, including the confession of appellant; and that this account was also contained in another daily paper of large circulation published in said city, to wit, the Tribune; that the circulation of these papers during the three or four days following the homicide was greatly increased on account of this very homicide, and the startling circumstances connected therewith. In addition to this, photographs of the appellant and his mother, with different views of the scene of the homicide, were put on exhibition in one of the principal streets of the city of Galveston, and remained there for several days, being viewed by crowds of people. The homicide, and the circumstances connected therewith, were matters of conversation among all classes of society for a considerable length of time. Expressions were shown as coming from a number of persons that appellant should be hanged; that he should be executed, either by hanging or burning, that no fate was too bad for him. In connection with this, it was also made manifest that other reports of an exceedingly prejudicial character were circulated in regard to appellant, and that such reports gained credence and were widespread throughout the city of Galveston. Witnesses from all classes of society testified in regard thereto. Some nineteen witnesses were produced on the part of appellant, none of whom were shown to have any particular interest in him, but who testified to the sentiment of the people regarding the guilt of appellant. All seemed to believe him to be guilty, and all seemed to believe that there was a great

prejudice against him, both on account of the murder and its publicity and other reports concerning appellant. Against this array of testimony the State marshaled but three witnesses, each of whom, it seems, was interested in the prosecution; one being the sheriff, another the district attorney, and the other the chief of police of the city of Galveston. It is true they did not impugn the integrity of the compurgators testifying on the part of appellant. They only testified as to their credibility in connection with their means of information. But we submit that the volume of testimony here offered on the part of appellant—coming as it does from a number of disinterested witnesses, men long residents of the city of Galveston, and pursuing various vocations—is entitled to more weight than that of only three witnesses who testified for the State. We would not be understood as disparaging the integrity of the State's witnesses. We only mean to say that the mass of testimony offered by appellant, coming as it does, outweighs, in our opinion, the testimony offered on this subject by the State. And we believe if there can be a case where prejudice can be engendered on account of the crime itself, and the reports circulated in connection therewith, that this is such case. We believe that the court erred in not changing the venue on the showing made.

It has been the uniform holding of this court that the question of a change of venue is a matter resting within the sound discretion of the court, and, unless there is abuse of such discretion, the action of the lower court will not be revised. Judged by the matters contained in the bill of exceptions on this subject, we are constrained to the opinion that the proper discretion of the court required a change of venue in this case. If we look beyond the testimony itself and what occurred during the trial, we are strengthened in this view. The venire of 150 men, taken almost entirely from the body of the city of Galveston, was soon exhausted, resulting in the selection of but two jurors. A special list of talesmen containing 200 jurors was then summoned. Of these, it appears that 165 of the 200 talesmen were summoned from the mainland, the balance being summoned from the city of Galveston. Nearly 400 men were examined altogether before the jury was obtained. A number of the jurors who were summoned had formed opinions in the case, and appellant was compelled to take some who had formed opinions. All this shows that appellant was very much hampered in the selection of the jury by the fact that the crime and its notoriety had been spread through the country, and that on this question a great many persons had formed opinions; not only so, but were prejudiced against appellant on account of the atrocity of the offense and other circumstances rumored against appellant. While it is a circumstance in favor of the action of the court in any case that a just result has been reached, yet this, of itself, is not a complete answer to the proposition. Our law apprehends that a defendant shall have a fair and impartial trial, and to this end it is provided that he shall not be tried in the county where the

prejudice is so great against him as that he can not expect such trial. Taking it for granted that prejudice is not simply prejudgment, but is prejudgment coupled with some degree of ill will, it will be seen from this record, not only that a great number of the citizens of Galveston had formed an opinion adverse to appellant, but that it went to the extent, on account of the atrocity of the crime charged against him and other circumstances of a defamatory character in circulation in the community in connection with the offense, such as to prejudice them against him and his cause. Under the circumstances, he did not have as fair and untrammeled an opportunity to select a jury as if no such prejudice existed against him; but throughout, in the selection of the jury, he encountered this prejudice, which was calculated to seriously impair his rights in the selection of the jury; and as prejudice is often of a sinister character, and remains under cover, it is difficult to guard against it, and it may be in this case that such prejudice found its way into the jury box. This is made manifest, as stated before, in the selection of the jury. We will discuss this question, however, more fully in connection with appellant's bills of exception numbered from 3 to 9 inclusive, all of which were taken to the action of the court in impaneling the jury.

The jurors Outerside, McHenry, Cheek, Eggert, Pennock, Wisrodt, and Rogers stated that they had formed opinions in the case. The first five were challenged peremptorily, and Wisrodt and Rogers were taken. Several of them said they shared the public opinion considering the defendant guilty, but that, if he could prove himself innocent, they would let him go free; otherwise, they would not do so; that at present they had an opinion that said defendant was guilty. Each of said jurors, after he had been examined by counsel, was then examined by the court, to which the general response was that they could give the defendant a fair trial; that they knew nothing about the case, except what they had read in the newspapers and what they had heard as rumors about it; that they could discard the opinions they had on the evidence put before the jury, and would not be influenced by the opinion formed.

As to the juror Rogers, who was examined at length, the appellant's challenges being exhausted, he was compelled to take said juror. The record presents his evidence in full, being questions and answers. We gather therefrom that said juror had read what the newspapers said about the homicide at the time the tragedy occurred, and that he had heard a great deal about the defendant and the case, and that, from the newspaper reports and the expressions of opinion that he had heard, he thought defendant guilty as a matter of course, and that he entertained the opinion then that he was guilty; that recently—what he had heard since the trial had been up on motion for change of venue—his opinion as to the guilt of defendant had been strengthened, and that it would be necessary for defendant to prove himself innocent before he would acquit him; that it would not require a great deal of evidence on the part of defendant to change his mind in that particular. On cross-examination by the State, he stated that he felt that he was in the condition of

mind to go into the jury box and try the case according to the evidence adduced on the trial; that the opinion he had was not to such an extent as not to permit him being a juror; that he thought he could consider the testimony without weighing the opinion that he then entertained at all; that he could go into the jury box, and give defendant the benefit of the presumption of innocence, until the proof satisfied him that he was guilty. It is further manifested by affidavits in this record that this juror, Rogers, while in the jury box, was among the first to insist on capital punishment for appellant, and the affidavit further suggests that he used against appellant matters not in testimony. While this is denied, yet it is suggested that this juror, Rogers, was not a fair and impartial juror. The record shows that he had a fixed opinion, and, while he formed it from newspaper accounts, that these newspapers detailed all the evidence, including appellant's confession. In our opinion, the court should have sustained the challenge to this juror for cause. Suit v. State, 30 Texas Crim. App., 319; Shannon v. State, 34 Texas Crim. Rep., 5.

Appellant, by several bills of exception, objected to the introduction of the confessions of appellant,—said confessions being made to Jones, chief of police, Geehan, reporter for the Galveston News, and Chubb, reporter for the Galveston Tribune,—on the ground that said confessions were made while defendant was in custody, and were not freely and voluntarily made, but were induced by coercion; and, as to the confessions made to the reporters, that, in addition, the confession to them was made long after the warning by the sheriff and chief of police, and at a time when said defendant was not mindful of the warning previously given to him. The first two bills of exception relate to confessions made to Jones, chief of police. The bills set out the confessions in full, and state that said Jones was permitted to testify to same, and then proceeds to state that said testimony was objected to at the time it was offered, upon the following grounds: "That said so-called 'confession' was not freely and voluntarily made, but was forced on defendant, who was at the time under arrest, by a course of pursuasion and accusation of more than an hour's duration, and which was participated in by the chief and deputy chief of police of Galveston, a reporter, and several officers of the police and detective force of said city, which said course of treatment was calculated and intended to so intimidate and overcome said defendant as to procure from him some statement directly implicating himself with the commission of said homicide; all of which is more fully and specifically set forth in the statement of facts filed in said cause. The court overruled said objection, and admitted said testimony, to which appellant excepted." The court appends the following explanation: "This approval is not to be taken as certifying the matters stated above as ground of objection were true in fact, but only that they were stated by counsel for defendant as grounds upon which he objected to the introduction of the evidence." Of course this qualification of the judge would ordinarily, under the rulings of this court, eliminate this ques-

tion, as the bills do not set out the facts under which the confession was made, but merely urge against the admission of said confession objections based on the grounds stated. These bills, however, contain a reference to the statement of facts filed in the cause, constituting the predicate for the admission of said testimony. The judge's qualification would not appear to nullify this reference, but only eliminate the grounds of objection stated, as not constituting a certificate of the predicate facts. If we refer to the statement of facts, we find that much testimony was elicited on the question as to whether or not the predicate was sufficiently laid for the introduction of said testimony.

On this subject we summarize from the evidence of W. C. Jones as follows: "It would be hard to say how long he was in my office before he made the confession to me. Don't know whether it was a half hour or an hour. Know it was no longer than two hours. It was a half hour to an hour. A portion of the time I was writing at my desk. During this time they were talking. He did not remonstrate about being questioned. He made one remark that I recollect very distinctly before they went out, and that was that he would not be bulldozed into anything. He referred particularly to one Dave Jordan. I do not think that Jordan brought the shirt into my office. It was either Amundsen or Murphy. One brought in the shirt, but Dave Jordan took the shirt off the desk in the northeast corner of the room, and came towards defendant, and remarked, 'Here is the evidence of your guilt; you might just as well admit it,' or something to that effect. I did not see Jordan turn up one of the cuffs, and point to a stain on the inside of the shirt, just behind the cuff, and did not hear him then say, 'Here is the blood of your mother upon this shirt.' They were all questioning him at the same time. * * * They kept on questioning him further, and trying to get a statement from him. We wanted to find out the truth. That is the rule with every prisoner in regard to murder, that they have. They question him very close. You may term it a 'sweat-box system,' if you like; I don't so consider it. No; I do not think my office can be called a 'sweat-box.' Defendant made the remark that he did not want to be bulldozed when Dave Jordan came at him with this shirt. I do not recollect the exact details. I think it did not seem to intimidate him. I mean by 'came at him,' that Jordan picked up the shirt from the table or desk where it had been laid, and had the shirt in his hand, and walked across the room to where defendant sat. In a way, I think he charged him with the murder of his mother. Chubb might also have taken the shirt in his hand at that time and gone up to him, and said, 'You have killed the best friend you ever had in the world.' There was a good deal that went on there that morning. The officers each one took a turn at him. * * * I think that immediately preceding the confession he made to me and Deputy Chief Amundsen, he was carefully and closely questioned in my office for an hour or more. I think these officers questioned him very closely. I think he was questioned with all the ability at the command of those officers. I believe they made

the best effort they knew how, in their questioning of him, to make him make a true statement of the case. He was very free to talk, and insisted upon talking, but at this time he did not admit any connection with the crime itself, because he strenuously denied that. I do not recollect whether he denied it once or many times. He strenuously denied it all this time he was questioned by two detectives, one or two officers, myself, and the deputy chief. The News reporter was in there part of the time. * * * After they all went out of my office, we had some few words. I do not recollect exactly the tenor of them. And defendant sat in the chair with his head thrown back, with his eyes about half closed, I think for about five minutes, when he remarked to me, 'I want to tell you this thing exactly as it happened.' I said, 'Hold on, I want someone else present if you are going to make a confession.' He said, 'I would not do it while they were in here.' I thought he had reference to the manner of Jordan. * * * He made his statements without any questioning at all until about through. Before he made it, I again told him that whatever he said would be used against him as evidence. He sat with his eyes half closed, and he then said to me: 'What I said in the statement that I made to the reporter Chubb was not correct. It was not true, and I now will make a true statement of what occurred.'" He then made the confession which was introduced in evidence.

We summarize from Dave Jordan's testimony for the defense as follows: "I remarked to the chief that morning that he was not the boy I had known before; that there was something the matter with him. I thought he might be in a hypnotic state, or he was a spiritualist. I thought at the time his condition was so pronounced that he was under hypnotic or some other influence. After I got through talking to him about the shirt, I left the room. He did not request all to leave the room except the chief. I left the room because I was through with him. He had not made the confession to me, but I knew he would. That is why I was through with him. I knew that he would confess, because of my knowledge of men. The purpose of my whole examination was to get him to tell the facts. I knew he would make a statement. I accused him of killing his mother on Sunday morning. I pictured the case to him. I showed him the garment. I told him that was his mother's blood. I did not know whether it was or not. The purpose of making that statement to him was I wanted to get a statement from him. No one, to my knowledge, told him if he would make a statement they would protect him from violence. During this whole hour and a half no remark was made to him to the effect that he would be protected if he made a statement; nothing of the kind, in substance. I asked him to make a statement. I told him it would be better for him to relieve his conscience. I told him he would be relieved in conscience if he did. He denied the crime. He never connected himself with the act of the killing. That is why I kept at him. All I wanted was to get an account of the killing itself. I had to put the questions in many different ways to him.

The reason, when I considered him in that condition, that I pressed those questions upon him, was I knew he was guilty. I was satisfied that he was the guilty party."

There is other testimony in the record bearing on this predicate. All the testimony tends to show that from an hour to an hour and a half appellant was in the office of W. C. Jones, chief of police. The chief and several deputies and detectives were present and two newspaper men, and during all that time appellant was closely interrogated by the parties then present. He was beset by first one and then another. For a long time he persisted in his denial, but at last yielded, and agreed to make a true confession, and requested all to go out except the chief of police. The chief brought in Amundsen, a deputy, and the confession was then made. He was very much broken down by the course of his treatment by the officers and detectives. They described him as exhausted, with his head thrown back, and his eyes closed when he made the confession; and one of them states that he was very weak, but not quite collapsed. We do not quote from the defendant's own testimony, but his evidence is stronger than that of the State on this line, indicating that the officers harassed and badgered him, and that he was overcome by their coercion and persuasion.

Our statute is very guarded in its terms. It not only requires that a proper caution be given the prisoner, but, in addition thereto, it must be shown that the confession made is a voluntary statement of the accused. See Code Crim. Proc., art. 790. And, where a question is raised as to the free and voluntary act of a defendant in making the confession, the court will not only look to the language used at the time, but to all the surrounding circumstances, in order to determine whether or not the confession is the voluntary act of the accused. In Thomas v. State, 35 Texas Criminal Reports, 179, the court used this language: "The burden is on the prosecuting power to prove that the confession was voluntary. A confession, especially an affirmative one, appearing to have been made with no expectation of its bringing good or averting evil, is termed 'voluntary' (1 Bishop New Criminal Law, section 1223); the real question being, in every case, whether or not the confessing mind was influenced in a way to create doubt of the truth of the confession. The burden being on the State, the doubt must be excluded. An involuntary confession, uttered to bring temporal good or avert temporal evil, even when the contemplated benefit is small, will be rejected. The circumstances under which the confession was made are of very great importance. They must be looked to in all cases, and when this is done, and there is nothing pointing to the motive prompting the confession, it will be received. Now, whether there is an express or implied promise to aid the suspected person, or a threat of temporal injury, or whether the suspected person is told that it would be better for him to confess, etc., does not always solve the question. It is true that the inducement under which the confession was uttered is of prime importance, but not always decisive. The inducement and the surrounding circumstances decide the

question. The inducement may not be sufficient to show the motive for the confession, but, when read in the light of the surrounding circumstances attending it, may be ample proof to create doubt of the truth of the confession. The judge should closely scrutinize these circumstances in connection with the inducement, and decide the question, and, if nothing pointing to the motive prompting it, appears, he should receive it, and over this sort of question the court has a wide discretion." And see Searcy v. State, 28 Texas Crim. App., 513.

It occurs to us that the environment here shown, in connection with this confession, is, at least, suggestive that same was not the free and voluntary act of the accused, but was superinduced by the conduct of officers, who,.to use their own language, "knew he was guilty," and determined to make him confess, and unquestionably employed means which we do not believe were in keeping with the spirit of our statute on the subject. While it is desirable to detect and punish crime, yet the safeguards thrown around the citizen should always be observed, especially by those who are in authority. We make these observations in view of another trial, and, inasmuch as the admission of this character of testimony is largely within the discretion of the trial judge, we would suggest the necessity, if any controversy is made in a subsequent trial as to the admission of said confession on the ground that it was not freely and voluntarily made, that the court give the jury a charge on this subject, which was not done in this case, though a charge on this subject was asked, and a bill of exceptions duly reserved to its refusal.

What we have said heretofore disposes of the other bills of exception relating to the testimony of Geehan and Chubb on the subject of confession. As to whether or not the confessions to these witnesses were made proximate in point of time in connection with the warning given by the chief of police, we think this sufficiently appears. See Barth v. State, 39 Texas Crim. Rep., 381.

We do not think the testimony of Neimeyer that Richardson, Simonton, and Ricker did not work for him in or about the Mascot Theater, in August, 1897, was admissible. The matter embraced in this testimony might concern the application for continuance, but was not competent on the trial.

As to the letter offered by appellant in evidence as presented in bill of exceptions, we do not think there was error in the refusal of the court to admit the same. For the errors discussed the judgment is reversed, and the cause remanded.

*Reversed and remanded.*

DAVIDSON, Presiding Judge, absent.