## UNITED STATES v. HOFFMAN et al.

(District Court. N. D. Illinois, E. D.
October 14, 1925.)

No. 5179.

**1. Escape ⬅3.**

At common law it was misdemeanor for sheriff or jailer to voluntarily or negligently permit prisoner in his lawful charge to depart from his custody, no matter how short the time.

**2. Escape ⬅3.**

"Escape" is voluntarily or negligently permitting person lawfully confined in jail to leave prison before he is entitled by law to be released.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Escape.]

**3. Contempt ⬅20—Escape ⬅3—Officer, authorized to imprison convict, willfully failing therein, is guilty of contempt of court committing prisoner, and of offense of escape (Rev. St. U. S. § 5409 [U. S. Comp. St. § 10308]; Cr. Code Ill. § 90 [Smith-Hurd Rev. St. Ill. 1923, c. 38, § 226]).**

Under Rev. St. U. S. § 5409 (U. S. Comp. St. § 10308) and Cr. Code Ill. § 90, relative to liability of sheriff or officer having charge of prisoners for escape, officer, charged with duty to imprison convict, who willfully fails in performance thereof, is guilty of contempt of court committing prisoner, and of offense of escape.

**4. Contempt ⬅20.**

After person is committed to prison, jailer has no discretion but to obey warrant of commitment, and may not, for his own convenience, or that of the prisoner, permit the prisoner to leave the jail.

**5. Contempt ⬅20—Writs committing defendants to jail held disobeyed by permitting prisoners to leave jail, making persons responsible amenable to District Court for contempt.**

Writs committing prisoners to jail held disobeyed by jail officers permitting certain prisoners frequently to leave the jail for various purposes, making persons responsible amenable to District Court for contempt.

**6. Contempt ⬅20—State jail officers, in executing writs of federal court, are officers thereof, and subject to punishment for contempt for disobedience or disregard of warrants committing prisoners to their custody (Resolutions Cong. Sept. 23, 1789, March 3, 1791, and March 3, 1821 [1 Stat. 96, 225, and 3 Stat. 646]; Rev. St. U. S. §§ 5536-5538 [U. S. Comp. St. §§ 10520-10522]; Smith-Hurd Rev. St. Ill. 1923, c. 75, §§ 2-6).**

Under Resolutions of Congress of September 23, 1789, March 3, 1791, and March 3, 1821 (Rev. St. U. S. §§ 5536-5538 (U. S. Comp. St. §§ 10520, 10521, 10522), and Smith-Hurd Rev. St. Ill. 1923, c. 75, §§ 2-6, authorizing use of county jails by United States, officers in charge of state jails, when executing writs of federal court, are for that purpose officers of such court, and are subject to punishment for contempt for disobedience or disregard of warrants or orders committing persons to their custody.

**7. Conspiracy ⬅40—Prisoners paying for privilege of leaving jail held parties to conspiracies to disobey writs of commitment, and violate statute as to escapes (Criminal Code, § 138 [Comp. St. § 10308]).**

Prisoners, making payments to jail officers to obtain privilege of leaving jail at various times and for various purposes, held parties to conspiracy to disobey writs of commitment and obstruct administration of justice, and conspiracy to violate Criminal Code, § 138 (Comp. St. § 10308), relative to escapes.

**8. Contempt ⬅60(3).**

Evidence held to establish disregard of process of federal court by superintendent of county jail in permitting prisoners to leave jail.

**9. Contempt ⬅28(1).**

Directions of sheriff are no protection to superintendent of jail for disregard of process of federal court by permitting prisoners to leave the jail.

**10. Contempt ⬅60(1).**

In criminal as well civil affairs every man is presumed to know what he can learn on inquiry, on having facts in his possession suggesting inquiry.

**11. Contempt ⬅20—Sheriff held chargeable with disobedience of federal writ committing prisoners to county jail, although having no connection with bribery and corruption (Smith-Hurd Rev. St. Ill. 1923, c. 125, §§ 13, 16).**

Under Smith-Hurd Rev. St. Ill. 1923, c. 125, §§ 13, 16, relating to sheriffs, sheriff held chargeable with disobedience of federal writ by his subordinates in permitting prisoners to leave county jail, although having no connection with bribery and corruption, in view of facts shown by records of his office.

Judgment affirmed 13 F.(2d) 278, 280.

John E. Byrne, of Chicago, Ill., for the United States.

Alfred S. Austrian, of Chicago, Ill., for defendants.

WILKERSON, District Judge. Respondents were cited to show cause why they should not be punished for misbehavior as officers of this court in their official transactions, and for disobedience of the writs and commands of this court in the cases of United States v. Terrence Druggan and United States v. Frank Lake. They answered the rule, and the issues made and the evidence adduced thereunder have been presented to and heard by the court.

Druggan and Lake were found guilty, on July 11, 1924, of violating an injunction issued by this court in a suit under the National Prohibition law, and were each sentenced to serve one year in the county jail of

Cook county, Ill., and to pay a fine of $1,000. The judgments were affirmed by the Circuit Court of Appeals. —— F.(2d) ——. Lake was committed to jail on October 11, 1924, and Druggan, on November 11, 1924. The writs of commitment are directed to the marshal of the Northern district of Illinois and to the keeper of the county jail at Chicago, Ill. They command the marshal to convey the respondents to the Cook county jail and the keeper of the jail to receive the respondents into the Cook county jail and there safely keep them until the expiration of the sentences, or until the respondents be discharged therefrom by due course of law. The returns on the writ for Lake are as follows:

"Received of Robert R. Levy, marshal of the United States for the Northern district of Illinois, the body of the within named prisoner this 11th day of Oct. A. D. 1924.

"Rec'd 10–11–24.

"W. H. Westbrook.

"By virtue of this writ, I conveyed the prisoner therein named to the jail of Cook county, Illinois, and there delivered him to the keeper thereof the 11th day of Oct., A. D. 1924.

"Robert R. Levy, U. S. Marshal,

"Marshal fees, 50¢.

"By Frank Farrell, Deputy."

The returns on the writ for Druggan are as follows:

"Received of Robert R. Levy, U. S. marshal for the Northern dist. of Ill's, the body of the within named prisoner, Terrence (Terry) Druggan, this 11th day of Nov., A. D. 1924.

"W. H. Westbrook, Supt. Cook County Jail,

"Per Harry Fulton, Jail Clerk.

"By virtue of this writ I committed to the Cook county jail the body of the within named prisoner this 11th day of Nov., A. D. 1924.

"Robert R. Levy, U. S. Marshal,

"By Frank Farrell, Deputy.

"Marshal fees: 1 service, 50¢."

In the case of Druggan, the evidence establishes beyond doubt that there was a flagrant violation of the command of the writ to keep him in the jail until the expiration of his sentence, or until his discharge by due course of law. Shortly after Druggan was received into the jail, a dentist, Franklin R. Percival, was permitted to give him treatments in the jail. Early in January, 1925, it was arranged that Druggan should be taken to the dentist's office under guard for treatments. It is shown that he was out of the jail, ostensibly to receive dental treatments, about 90 times. He usually remained at the dentist's office from 10 o'clock in the morning until 3 o'clock in the afternoon, and sometimes longer. His meals during this period were brought to him at the dentist's office. The dentist testified that Druggan was very nervous, and that he could work on his teeth for only a few minutes each day. Druggan spent most of his time in the smoking room of the dentist's suite. Druggan paid this dentist $3,200.

It further appears that Druggan was permitted to go to his apartment at 999 Lake Shore Drive at night. Sometimes he remained there during the entire night, and returned to the jail in the morning without a guard. The number of the visits to the apartment is not definitely shown. According to the evidence there were at least 6 of them, and probably not more than 30. Druggan was taken also several times to his country home near Lake Zurich. Druggan was taken to the safety deposit vaults of the Continental & Commercial Bank Building three times and permitted to transact business there. On August 15, 1925, Druggan was released from the jail and remained away 3 days. He returned and was again released on the 19th of August. Upon the advice of his attorneys, he returned to the jail on the 21st of August, since which date he has been confined, either in the custody of the marshal or in the jails of Cook and De Kalb counties.

In the case of Lake, about 12 visits to the dentist's office were permitted. The dentist received $1,500 for the services to Lake. Lake was released from the jail on the 20th day of July. This was 82 days before the expiration of his sentence and 22 days before he was entitled to a discharge, if he were given the allowance for good time for which provision is made in the Act of June 21, 1902, c. 1140, § 1 (32 Stat. 397 [Comp. St. § 10532]), for prisoners convicted of offenses against the laws of the United States.

[1, 2] At common law it was a misdemeanor for a sheriff or jailer having lawful charge of a prisoner to voluntarily or negligently permit him to depart from his custody, no matter how short a time the departure might be. An escape is defined to be voluntarily or negligently permitting a person lawfully confined in jail to leave the prison where he is confined, before he is entitled by law to be released therefrom. Ex parte Shores (D. C.) 195 F. 627, 630.

Section 5409, R. S. (Comp. St. § 10308), provides: "Whenever any marshal, deputy marshal, ministerial officer, or other person has in his custody any prisoner by virtue of process issued under the laws of the United States by any court, judge, or commissioner,

and such marshal, deputy marshal, ministerial officer, or other person voluntarily suffers such prisoner to escape, he shall be fined not more than two thousand dollars, or imprisoned * * * not more than two years, or both."

[3] Section 90 of the Criminal Code of Illinois (Smith-Hurd Rev. St. Ill. 1923, c. 38, § 226) provides that a sheriff or jailer who voluntarily suffers the escape of any convict in his custody shall be imprisoned in the penitentiary not less than one nor more than ten years. An officer charged with the duty under a writ of court to continuously imprison a convict for a term, who willfully fails in the performance of that duty, is guilty, not only of contempt of the court committing the prisoner, but of the offense of escape, whether tested by state or federal law. Re O'Rourke (D. C.) 251 F. 768.

[4] In cases where a person is committed to prison pursuant to his conviction of a prison offense, the jailer has no discretion (except in cases of emergencies) but to obey the warrant of commitment. He may not rightly consult his own convenience, nor that of the prisoner, and permit the latter to leave the jail and return thereto at pleasure. Persons are committed to jail for the purpose of imposing upon them the penalties they have incurred because of their violation of the law; and it is not for the jailer to remit any part of that punishment. If sickness or other circumstances should arise, which make it proper to grant the prisoner some indulgences, the jailer must apply to the proper authorities for permission to grant the same.

In Clap v. Cofran, 10 Mass. 373, the jailer had permitted the prisoner to occupy the jailer's apartments frequently during the night, which he had no authority to do, and it was held that the jailer had permitted a voluntary escape. The jailer attempted to justify his conduct upon the ground that it had been the custom or practice of jailers for a long time to permit certain classes of prisoners to occupy during the nighttime the apartments occupied by the jailer and his family, and to take their meals with them. But the court held that the fact that the jailer had for a long time permitted and indulged his prisoners in the privilege of spending their evenings in the kitchen in his dwelling did not excuse the jailer for the escape, and that any partial indulgence depending upon the favor of his jail keeper, was an abuse of his authority, which could not be justified by its continuance for any length of time.

[5] The admitted facts in this case show that the writs for both Lake and Druggan were disobeyed. The disobedience, particularly in the case of Druggan, was of such a character as to make a farce of the process of this court. For the violations of the law of the state and the United States which may be involved, the respondents, of course, are not on trial. For the disregard of the orders of commitment, those who are responsible are amenable to this court in this proceeding, and it remains to fix the legal responsibility for such disobedience.

The United States does not maintain regular places in the several states in which to confine persons sentenced for other than penitentiary offenses, but uses the state jails for that purpose. The several states, no doubt, may refuse to allow the use of their jails and prisons for such purpose, and, should they do so, the United States court may not lawfully commit persons to such jails, and the jailers cannot be required to receive them.

The Congress, on September 23, 1789, adopted a resolution requesting the Legislatures of the several states to pass laws making it the duty of the keepers of their jails to receive and safely keep therein, under the same penalties as in the case of state prisoners, all prisoners committed under the authority of the United States until they shall be discharged by due course of the laws thereof; the United States, however, to pay for the keeping and support of such prisoners as they shall commit to such jails (1 Stat. 96).

On March 3, 1791, the Congress passed another resolution, which, after referring to the resolution of September 23, 1789, provides that, in case any state shall not comply with the request in the resolution of September 23, 1789, the marshal in such state may be authorized to hire a convenient place to serve as a temporary jail, and to make all necessary provision for the safe-keeping of prisoners committed under the authority of the United States, until permanent provision shall be made by law for that purpose (1 Stat. 225). The last-named resolution is, in substance, carried into the resolution of March 3, 1821 (3 Stat. 646), and sections 5536–5538, R. S. (Comp. St. §§ 10520, 10521, 10522).

Pursuant to the resolutions of Congress, Illinois has passed laws concerning the keeping of federal prisoners in state jails. The pertinent provisions (Smith-Hurd Illinois Revised Statutes, 1923, p. 1227, c. 75) of the Illinois statute in relation to jail and jailers are as follows:

"Sec. 2. The sheriff of each county in this state shall be the warden of the jail of the county, and have the custody of all prisoners in such jail.

"Sec. 3. He may appoint a superintendent of the jail, and remove him at pleasure, for whose conduct he shall be responsible.

"Sec. 3a. Employees who are charged with the care and custody of prisoners shall be known as jail officers.

"Sec. 4. The warden of the jail shall receive and confine in such jail, until discharged by due course of law, all persons who shall be committed to such jail by any competent authority.

"Sec. 5. The provisions of the preceding section shall extend to persons detained or committed by authority of the United States, as well as of this state.

"Sec. 6. The warden of the jail shall be liable, for failing to receive and safely keep all persons delivered under the authority of the United States, to like pains and penalties as for similar failures in the case of persons committed under the authority of this state. * * *"

[6] The United States, by this arrangement with the state of Illinois, has the lawful right to the use of the jails of the several counties of Illinois in which to confine prisoners committed by authority of the United States. It is the duty of the sheriff, superintendent, and their deputies to receive and detain in the jail such prisoners until their terms of imprisonment expire, or they are otherwise discharged from the prison by the authority of the United States. The state jail is to be deemed the jail of the United States for this purpose. The keeper of the jail is the keeper of the United States. Those charged with responsibility for the execution of the writs of the United States court are to that extent and for that purpose officers of the United States court, and are subject to punishment for contempt for disobedience or disregard of the warrants or orders committing such prisoners to their custody. Randolph v. Donaldson, 9 Cranch, 77, 86, 3 L. Ed. 662; Swepston v. United States, 251 F. 205, 163 C. C. A. 361; In re O'Rourke (D. C.) 251 F. 768; Ex parte Shores (D. C.) 195 F. 627; In re Birdsong (D. C.) 39 F. 599; Servis v. Marsh (C. C.) 38 F. 794.

The respondents Lake and Druggan have admitted the facts concerning their absences from the jail. Their testimony in this respect is corroborated by the testimony of the dentist, the jail guards, Druggan's chauffeur, elevator operators at 999 Lake Shore Drive, the clerk of the safety deposit vaults, and by the records of the jail itself. They claim that the evasions of the writs under which they were committed were procured by the payment of large sums of money. They assert that, when they commenced to serve their sen-

tences, they were subjected to harsh treatment and were coerced into paying money for privileges which were rightfully theirs in the jail, and that, by means of the payment of money, they procured special privileges in the jail, as well as permission to leave the jail. Druggan claims that he paid to Foerst at the rate of $2,000 a month until about the 1st of May, and after that date to Westbrook at the same rate. Smaller amounts, he states, were paid to Thompson, Fitzgerald, and other deputy jailers and guards. He also claims to have paid Westbrook $2,000 for the order releasing Lake from jail before the expiration of his term. The bribes concerning which Lake testified were for privileges in the jail, with the exception of $1,500, which he claims to have paid for the privilege of visiting his sister, who was ill at the hospital, and of attending her funeral.

[7] The effect of the testimony of Druggan and Lake is to charge themselves with being parties to a conspiracy to disobey the writs of commitment and to obstruct the administration of justice. In Biskind v. United States, 281 F. 47, 50 (28 A. L. R. 1377), the Circuit Court of Appeals for the Sixth Circuit upheld an indictment charging a conspiracy under section 37 of the Criminal Code (Comp. St. § 10201) to commit the offense covered by section 268 of the Judicial Code (Comp. St. § 1245), which provides for punishment of contempts of court. The court said:

"Willful and intentional disobedience of the order of a court of competent jurisdiction (even though made in a civil cause) is criminally punishable, so far as the proceeding is in vindication of the authority of the court. Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Bessette v. W. B. Conkey Co., 194 U. S. 324, 24 S. Ct. 665, 48 L. Ed. 997; Proudfit Co. v. Kalamazoo Co. (C. C. A. 6) 230 F. 120, 132, 144 C. C. A. 418, and cases there cited. In Brown v. Trust Co., 193 F. 622, 113 C. C. A. 490, we sustained a finding of criminal contempt for failure to comply with an order of a referee in bankruptcy requiring the surrender of certain rooms in a hotel to the trustee in bankruptcy of the hotel company. In Swepston v. United States, 251 F. 205, 208, 163 C. C. A. 361, we affirmed an order adjudging guilty of contempt of court a state sheriff, who was custodian of the county jail, and a deputy sheriff, who was keeper thereof, in conspiring for and in conniving and assisting a federal prisoner therein to escape from jail and to be at large and beyond the confines thereof. Direct analogy between that case

and the instant case is not lacking. The object of the conspiracy in the instant case was to effect a disobedience by Meyer of the process of commitment issued by a federal court, and so prevent the carrying out of that process and the order on which it was issued.

"True, section 268 is contained in the Judicial Code, and not in the Criminal Code. But the lack of specific provision for criminal prosecution therefor is not important here, where the prosecution is for conspiracy, not for the contempt; for 'a conspiracy to commit any offense which by act of Congress is prohibited in the interest of the public policy of the United States, although not of itself made punishable by criminal prosecution * * * is a conspiracy to commit an "offense against the United States" within the meaning of section 37' of the Criminal Code. United States v. Hutto, 256 U. S. 524, 528, 529, 41 S. Ct. 541, 65 L. Ed. 1073. Whether or not a contempt of the authority of a federal court in a civil case would be subject to criminal prosecution, there is no room for doubt that a conspiracy, such as here shown, to effect a contemptuous disobedience or resistance to the lawful process of a federal court in a criminal cause, is a conspiracy to commit an offense against the United States."

See, also, Taylor v. U. S., 2 F.(2d) 444 (C. C. A. 7).

Respondents Druggan and Lake have also charged themselves with being parties to a conspiracy to violate section 138 of the Criminal Code (Comp. St. § 10308), which covers the offense of permitting prisoners to escape. See Ex parte Lyman (D. C.) 202 F. 303.

Respondent Foerst, who was Westbrook's secretary until April 30, 1925, accompanied Druggan on a large number of the trips to the dentist. He also went with Druggan seven or eight times to an apartment on Lake View avenue, and twice to Druggan's farm in the country. Foerst was also with Lake on the trips of that respondent to the dentist. Foerst claims to have received from Lake and Druggan $3,500 which he kept for himself and $4,000 which he turned over to Westbrook. He received from Lake and Druggan and turned over to deputy jailers smaller sums, aggregating about $1,000. He asserts that the violations of the writs of commitment were with Westbrook's knowledge and were committed under his instructions as superintendent of the jail.

Respondent Thompson, who was an assistant jailer, accompanied Druggan and Lake to the dentist first under orders from Foerst and then under orders from Westbrook. He testified that there were standing orders to take Druggan to the dentist whenever the dentist sent for him. He took Druggan to his apartment about 20 times. Druggan's chauffeur called for them at the jail, and Thompson left Druggan at the door of the apartment. Druggan was left there without guard, and returned to the jail unattended. This, Thompson testified, was done with Westbrook's knowledge and under his direction. He said that Druggan had the same access to his quarters at the jail that he would have had if he roomed at a hotel. For Thompson's participation in the violations of the commitment, he received $100 or $200 from Foerst and $200 a month from Druggan. Thompson was in charge of the jail when Lake was discharged on July 20, 1925.

Respondent Fitzgerald was an assistant jailer. The records show that he was on watch at the jail a number of times when Druggan was taken by Foerst and Thompson to the dentist. He also admits that he knew that Druggan was permitted to go out at night. For his participation and acquiescence in these matters he received $200 from Foerst and $300 from Druggan. He also permitted Druggan's release from the jail in August, although a letter from the sheriff forbidding it was in his possession at the time. He claims he neglected to look at the letter until it was too late.

Respondents Strassheim and Schwantes were assistant jailers. So far as the jail records show, they did not accompany Druggan and Lake on any of their trips from the jail. Each of them received $200 from Foerst and $200 from Druggan. The records show that each of them was on watch on some of the occasions when Druggan and Lake were permitted to leave the jail. Respondent Pendl was the locksmith of the jail. He went with Foerst when he took Lake to his sister's funeral, and received $100 from Foerst.

[8, 9] Respondent Westbrook was the superintendent of the jail. While he was appointed by the sheriff, and subject to removal by him at will, he was in actual charge of the jail. The records of the jail, which were kept under his direction and for his guidance, brought home to him actual knowledge of Druggan's many trips to the dentist's office. It is established that he knew about Druggan's absences from the jail at night. He is shown to have been at the jail on at least two occasions when Druggan returned in the morning unattended. His participation in and responsibility for the release of Lake are established beyond a reasonable doubt. In view of the testimony of Thompson as to his conversation with Westbrook after Lake's release, it was incumbent on Westbrook to produce evidence concerning his whereabouts on

July 20, 1925, and the facts about the trip which he claims to have taken at that time. He is not here on trial for violations of the federal statutes with reference to the offenses of conspiracy, obstruction of justice, escape, and bribery. He is answerable here only for the disobedience of the court's writ. And, quite independent of his alleged acceptance of bribes, it is clearly established that he is guilty of a willful and flagrant disregard of the process of this court.

In the very nature of things, it is impossible that what was done in connection with that process could have been done without his permission and participation. He pleads the suggestions and orders of the sheriff in mitigation. The directions of the sheriff, if given as he claims they were given, are no protection to him. His duty was to obey the process of this court. The orders of the sheriff, even if they had been proper and lawful, did not warrant the excesses which were committed in alleged compliance with them. Respondent's Westbrook's contention here that he was obeying orders in this outrageous flaunting of the process of this court is a circumstance not in mitigation, but in aggravation.

Respondent Hoffman was the sheriff of Cook county. The statutes prescribing his duties and responsibilities as the warden of the jail have already been cited.

Section 13 of the statute of Illinois relating to sheriffs (Smith-Hurd Rev. St. 1923, c. 125) provides: "The sheriff shall be liable for any neglect or omission of the duties of his office, when occasioned by a deputy, in the same manner as for his own personal neglect or omission."

Section 16 of the same statutes provides: "The disobedience of any sheriff to perform the command of any writ, warrant, process, order or decree legally issued to him, shall be deemed the same, a contempt of the court that issued the same, and may be punished accordingly."

In County of La Salle v. Milligan, 143 Ill. 321, 336, 32 N. E. 196, 200, the Supreme Court of Illinois, speaking of the duties of the sheriff, said: "The sheriff is keeper of the jail, and charged with the duty of keeping therein all persons committed thereto by competent authority, and is held to the exercise of skill, care, and diligence in the discharge of that duty."

The sheriff, in answer to the rule, asserts that the misconduct in connection with the writs of commitment for Druggan and Lake was without his knowledge, and that therefore he cannot be held for disobedience of the writs. He asserts that in view of the large number of prisoners in the county jail, and in view of the large number of deputies required to perform the duties of the sheriff's office, it is impossible for the sheriff to exercise personal supervision over the jail and work of the deputies. He maintains that it would be a great injustice to hold the sheriff for acts like those under consideration here, unless it is established that they were committed under his direction or with his knowledge. This contention requires that the evidence be examined to determine whether or not the sheriff is chargeable in law with knowledge of what was done concerning the process of this court.

Respondents Lake and Druggan were brought to the personal attention of the sheriff shortly after they commenced to serve their sentences. One Morris Eller, who was well known to the sheriff, accompanied Frank Morrison, a business associate of Druggan, to the sheriff's office, and told the sheriff that it would be necessary for Morrison to see Druggan "quite often." Passes for that purpose were authorized by the sheriff. Bowman, another business associate, came to Assistant Sheriff Webster with a similar request. Webster reported the same to the sheriff, and was told that it was all right. These passes, which were an exception to the general rule as to visitors, were issued in large numbers from the sheriff's office. More than 200 of these passes, most of them signed by Webster, are in evidence. Webster testified that there was no other prisoner in the jail during the past year for whom there was issued anything like the number of passes which were issued for Druggan. About the time of Bowman's visit to the sheriff's office, Webster called Foerst on the telephone and requested that all the courtesies at his command be extended to Mr. Bowman, who had some business matters to take up with Terrence Druggan.

On January 10, 1925, the sheriff wrote the following letter in longhand to Westbrook:

"Jany. 10–25.

"Capt. Westbrook: The bearer of this note, Mr. B. J. Bowman, is a friend of mine and have known him for many years. He was manager of the Hotel Morrison for years. His honor and integrity are beyond reproach. Absolutely trustworthy. He has charge of the Standard interests, and is trying to save the property from entire destruction while out of operation. Do what you can for him, as his calls are of a business nature only.

"Yours, etc.,          Peter M. Hoffman."

On January 19, 1925, the sheriff gave personal directions that Druggan should be taken to the safety deposit vault to clip coupons.

The sheriff stated that under the law he could not deny him that right.

On February 18, 1925, Dr. Percival, the dentist, wrote a letter to the sheriff, stating that he had been treating Druggan's teeth at his office, and requested an order for the continuance of Druggan's visits to his office. The sheriff wrote to Westbrook that, if Druggan was in need of the treatment, "he should be permitted to receive same just the same as any other prisoner under guard." On February 26, 1925, a similar letter was written by Percival to the sheriff with reference to Lake, and this letter was referred to Westbrook.

The jail record shows that on February 21, 1925, the sheriff directly interfered with reference to Druggan and Lake. An order of this court was made, directing that they be brought to this courtroom. The sheriff gave personal instructions that they were not to be handcuffed. The jail log, which was kept for the information of the sheriff, and which, in view of the instructions given by him with reference to the visits to the dentist, it was his duty to examine, contains convincing evidence as to the impropriety of the trips away from the jail, authorized under the pretense of visits to the dentist and to the hospital. Only a part of Druggan's trips from the jail are recorded in the log. The record contained there is as follows:

| Date. 1925. | Destination. | In charge of | Time. | Watch. |
|---|---|---|---|---|
| Jan. 14 | Dr. Percival | Thompson-Edfeldt | 10 a.m.–3:15 | Thompson |
| " 15 | Dentist | " " | 9:30 | " |
| " 19 | " | " and deputy | 9:30 | " |
| " 20 | " | Foerst-Thompson | | Fitzgerald |
| " 24 | " | " " | | " |
| " 26 | " | Thompson | 10–3:30 | Thompson |
| " 27 | " | " | 10:30–4:05 | " |
| " 29 | " | " | 9:30–3:30 | " |
| Feb. 3 | " | Foerst | 1:30 | Strassheim |
| " 4 | " | " | 1:30–3:30 | Fitzgerald |
| Feb. 5 | Dentist | " | 12:30–3:56 | Fitzgerald |
| " 9 | " | " | 12:30–3:40 | " |
| " 10 | " | " | 11:15–4:45 | " |
| " 12 | " | " | 9:50–4:30 | " |
| " 20 | " | " | 10:10 | " |
| " 23 | " | " | 9:45–3:45 | Strassheim |
| " 26 | " | " | | Fitzgerald |
| " 27 | Hospital | (member of family Thompson) | 9 p.m.–11:40 | Thompson |
| " 28 | " | Thompson | 7 p.m.–10 | Strassheim |
| Mar. 1 | " | " | 7:15 p.m.–10:30 | Thompson |
| " 2 | Dentist | Foerst | 10:20 | Fitzgerald |
| " 2 | Hospital | " | 7:10 p. m.–11:20 | Thompson |
| " 3 | Out | " | 7:10 p.m.–11:30 | Fitzgerald |
| " 4 | Hospital | " | 7:10 p.m.–11:15 | " |
| " 5 | Dentist | " | 9:20–3:50 | Strassheim |
| " 5 | Hospital | Fitzgerald | 7 p.m.–11:15 | Schwantes |
| " 6 | " | Thompson | 7:15 p.m.–11:30 | Fitzgerald |
| " 7 | " | " | 7:15 p.m.–11 | " |
| " 8 | " | Foerst | 7:15 p.m.–11:45 | " |
| " 9 | Dentist | " | 9:15–3:45 | Strassheim |
| " 9 | Hospital | " | 7 p.m.–11:30 | Schwantes |
| " 11 | " with Lake | " | 3:15–7 | Strassheim |
| " 12 | " " " | " | 9:45–11:45 | Schwantes |
| " 16 | " " " | " | 7:30 p.m. | Fitzgerald |
| Returned prior to 8 a. m. March 17 | | | | Thompson |
| " 17 | Dentist with Lake | Foerst | 10:15 | Springer |
| " 22 | Out " " | " | 8 p.m. | Fitzgerald |
| " 24 | " " " | " | 10–3:45 | Schwantes |
| " 30 | " " " | " | | Fitzgerald |
| Apr. 23 | Dentist | " | 9:20–11:15 | Schwantes |
| July 17 | " | Miller | | Thompson |
| " 20 | " | " | 9 | " |
| " 22 | " | " | | " |
| " 28 | " | " | a.m. and p.m. | " |
| " 29 | " | " | 10 a.m. | " |
| " 30 | " | " | 10 a. m. | " |
| " 31 | " | " | | Schwantes |
| Aug. 3 | " | " | a.m. and p.m. | Thompson |
| " 6 | " | " | | " |
| " 11 | " | " | | " |
| " 12 | " | " | | Schwantes |
| " 13 | " | " | | Thompson |
| " 15 | " | " | | " |
| Sept. 23 | Federal Building with Lake. Returned 5:53 p. m. | | | Adams |

The records of Lake's visits outside the jail, as it is found in the log, is as follows:

| Date. 1924. | Destination. | In charge of | Time. | Watch. |
|---|---|---|---|---|
| Dec. 6 | Hospital | Foerst | 11:15 | Thompson |
| " 10 | " (John D. Murphy) | " | | Schwantes |
| " 12 | To see sister, now deceased, | Foerst | 5:30–11:20 | Strassheim |
| Dec. 13 | Out | Foerst | 7 p.m. | Thompson |
| " 14 | " | " | 7 p.m.–1:10 a. | Strassheim |
| " 15 | Funeral | " | 8:45–5:20 | Schwantes |
| Mar. 3 | Hospital | " | 11 a.m.–4 p.m. | Strassheim |
| " 6 | Doctor | Edfeldt | 9:20–3:30 | " |
| " 10 | " | " | 9:45–3:10 | " |
| " 11 | Hospital with Druggan | Foerst | 3:15–7 p.m. | " |
| " 12 | " " " | " | 9:45–11:45 | Schwantes |
| " 16 | " " " | " | 7:30 p.m. | Fitzgerald |
| | Returned prior to 8 a. m. March 17 | | | Thompson |
| " 17 | Dentist with Druggan | Foerst | 10:15 | Springer |
| " 22 | Out with Druggan | " | 8 p.m. | Fitzgerald |
| " 24 | " " " | " | 10 a. m.–3:45 | Schwantes |
| " 30 | " " " | " | | Fitzgerald |
| " 31 | " " " | " | 10:10 | Springer |

The following is a compilation from the log of professional services for all other prisoners in the jail from October 13, 1924, to August 12, 1925:

1924.
Oct. 13 Dentist to extract tooth
" 17 " for two patients
" 24 Doctor for eye treatment
" 25 Three doctors for eye treatment Same patient as Oct. 24
' 27 Doctor for eye treatment. Same patient as Oct. 24
" 28 Doctor for eye treatment. Same patient as Oct. 24
" 29 Doctor for eye treatment. Same patient as Oct. 24
" 30 Dentist to extract tooth
Nov. 3 Doctor to see patient
" 7 Dentist to extract tooth
" 13 Specialists (two) to examine eyes
" 17 Dentist to extract tooth
" 26 Dentist to extract tooth
Dec. 22 Dentist to treat tooth
1925.
Jan. 6 Dentist to extract teeth—two patients
Feb. 14 Dentist to extract tooth
" 25 Dentist to extract tooth
" 27 Doctor to examine gun shot wound
Mar. 19 Dentist to extract teeth
" 26 Dr. Singer to examine prisoner
Apr. 4 Dentist to see prisoner "to take wire out of jaw"
" 7 Dentist to extract tooth
" 28 Cantwell, lawyer, and doctor to examine prisoner
May 3 Dr. Neymann for emergency examination
" 11 Dentist to extract tooth
July 10 Two doctors to see prisoner to be sent to hospital for operation
Aug. 12 Dentist to extract teeth

The following is a compilation from the log of the record of all other prisoners who were permitted to go out of the jail for treatment during the time Druggan and Lake were in the jail:

1924.
Dec. 27 Prisoner sent in patrol to Cook County Hospital to have wounds sewn up. Accompanied by doctor and officer. 7:45–12:30.

1925.
Jan. 4 Prisoner sent to Bridewell for immediate operation in charge of Schwantes. 12:25 a. m.
Feb. 24 Prisoner to County Hospital for operation.
Mar. 7 Prisoner taken to see dead father accompanied by two deputies. Prisoner taken to see dying aunt. Accompanied by A. Pendl.
" 18 Prisoner taken to funeral. Accompanied by Pendl.
Aug. 22 Woman prisoner to Cook County Hospital, emergency case. 4–7:45.
" 30 Prisoner sent to Bridewell Hospital. Very ill.

No other prisoners were permitted to leave the jail under the pretext of receiving dental treatment. Dentists and specialists were required, as they should be, to visit their patients in the jail when necessary. The record in the case of Druggan and Lake can be explained on no other basis than that of concerted action to evade the court's process and to accord to these prisoners unusual and unwarranted privileges. The statement in the letter of the sheriff about "the same treatment as any other prisoner" had no foundation in fact, and a reference to his own records would have shown that it was without foundation.

Respondent Foerst told the sheriff that Druggan and Lake were paying money for favors in the jail. The sheriff testified that he told Foerst it was bad business and sent for Westbrook. He asked Westbrook if he was taking money. Westbrook denied it, and the sheriff did nothing more. He was warned

again by Christopher Strassheim, but did nothing because of his asserted faith in Westbrook. A reference to the records kept for his information and guidance, with knowledge of which the public interest requires that he be charged, would have disclosed that a large part of those records were devoted to a recital of the absences of Druggan and Lake from the jail, would have revealed the amazing contrast between the treatment accorded Lake and Druggan and that received by other prisoners, and would have put him in a position to discharge his public duty and to protect the process of this court.

In passing upon the plea of ignorance, the conduct of the sheriff with reference to the release of Lake cannot be overlooked. His failure to act when he was informed as to Lake's discharge is not consistent with the plea that what had been done concerning Druggan and Lake was without his knowledge and approval.

[10] Can it be said that the sheriff exercised care and diligence in the discharge of his duty concerning the process of this court? Is he chargeable in law with disregard of the orders and writs of the court? What is legal knowledge of a fact? It seems to be assumed by the sheriff that no one is chargeable with more knowledge than he chooses to have; that he is permitted to close his eyes when he pleases upon all sources of information, and then excuse his ignorance by saying that he does not see anything. In criminal as well as civil affairs, every man is presumed to know everything that he can learn upon inquiry, when he has facts in his possession which suggest the inquiry.

[11] While there is no evidence connecting the sheriff with the bribery and corruption in the jail, he is chargeable with the disobedience of the court's writ to the extent that he might have prevented it if he had acted with diligence. He must be charged here with knowledge of that which it was his duty to know. And, so charged, he is convicted of disobedience of the writ by the records of his office. Moreover, his order with reference to the trips to the dentist was an improper interference with the court's process. The request which the dentist and Eberhardt made was an unlawful request. It should have been refused, just as Eller's request to turn the jail into an office for the transaction of the business of the Standard Brewery should have been refused, and the sheriff cannot escape responsibility for his part in the program which has made a travesty of the orders and process of the court.

The court is dealing here directly with the disregard of its process. The case, however, presents a graver and far more serious aspect. The evidence concerning the crimes under sections 37, 39, 135, and 138 of the Criminal Code (Comp. St. §§ 10201, 10203, 10305, 10308) cannot be overlooked. It is the duty of the court to hold respondents Westbrook, Hoffman, Druggan, Lake, Foerst, Thompson, and Fitzgerald to the grand jury to answer those charges, and an order to that effect will be prepared by the district attorney. Bail in each case will be fixed at $3,000. Respondents who have given bail in the case now before the court will be permitted to offer the same sureties. A warrant will issue for Franklin R. Percival, returnable forthwith before this court, on the charges above specified, and the United States attorney will prepare the proper papers. He will be held to the grand jury, and his bail is fixed at $3,000.

I shall not dispose at this time of the contempt charges arising out of the alleged violation of the writ in the case of Frank Lake. The advice given by the United States attorney in this connection, and the letter written by the United States marshal after the writ had passed completely from his control, present a situation which requires further consideration. The case, so far as the Lake writ is concerned, will be taken under advisement, to abide the further order of the court. The orders with reference to alleged disobedience of the Druggan writ will be as follows:

The rule against Pendl is discharged.

The rules against Druggan, Foerst, Thompson, Fitzgerald, Strassheim, and Schwantes will be continued for disposition until December 7, 1925, at 10 o'clock a. m.

The respondent Westbrook is adjudged guilty of disobedience of the writ for the commitment of Druggan, as herein found, and is sentenced to four months in the county jail of De Kalb county.

The respondent Hoffman is adjudged guilty of disobedience of the writ of commitment of Druggan, as herein found, and is sentenced to 30 days in the county jail of Du Page county and to pay a fine of $2,500.

The United States attorney will prepare orders accordingly. Those holding certain respondents to the grand jury and the contempt matters arising out of the Lake writ may be presented to-morrow morning at 10 o'clock. Those in the contempt cases arising out of the Druggan writ may be presented Wednesday, October 28th, at 10 o'clock a. m. The record to-day in the contempt cases

growing out of the Druggan writ will show that they are continued until October 28th, at 10 o'clock a. m., for entry of orders in accordance with this decision. The time for the entry of the orders has been postponed, to give time for the preparation of applications for a supersedeas, which, in view of the nature of these proceedings, should be presented to the Circuit Court of Appeals.