THE STATE OF IOWA V. A. D. STORMS, Appellant.

**Voluntary Confessions:** Defendant, who was accused of murder, was taken from his cell and examined by an officer as to his whereabouts when the crime was committed.    He was also searched, and his shirt taken from him and kept for use as evidence.    On

the next day, having previously talked with his counsel, but not in private, he was shackled, and taken into the presence of the bodies of the deceased. On his return to jail, he requested an interview with the officer, which was granted. After being questioned again regarding his whereabouts, he asked the officer about pleading guilty, to which the officer replied "No; that he wanted to know if anyone else was implicated in the crime." He thereupon gave a connected account of the transaction, without being questioned, and without being informed as to what evidence there was against him. When the county attorney came, in response to the officer's request, he asked defendant if his confession had been made because of any inducements, and defendant replied, "No." *Held*, that his confession was properly received in evidence. *U. S. v. Bram*, 168 U. S. 532, disapproved.

BURDEN OF PROOF AS TO VOLUNTARY CHARACTER. Where a confession appears on its face to be free and voluntary, the burden is on defendant to rebut that presumption.

COURT AND JURY. The question whether a confession has been made with that degree of freedom which justifies admission in evidence is for the court, but when there is conflict in the evidence as to whether it was made voluntarily, and the court is in doubt, the question should be left to the jury.

REVIEW ON APPEAL. The conclusion of the trial court on the question whether a confession was voluntary will not be disturbed on appeal, unless clearly erroneous.

*Appeal from Louisa District Court.*—HON. W. S. WITHROW, Judge. ·

THURSDAY, APRIL 11, 1901.

DEFENDANT was indicted, tried, and convicted of the crime of murder. The jury fixed his punishment at imprisonment for life, and from the verdict and judgment defendant appeals.—*Affirmed.*

*Babb & Babb* and *Palmer & Kopp* for appellant.

*C. W. Mullan,* Assistant Attorney General, and *Chas. A. Van Vleck,* Assistant Attorney General, for the State.

DEEMER, J.—The conviction was secured largely on alleged confessions made by defendant to the chief of

police of the city of Burlington, at which place the crime was commited; and to the county attorney of Des Moines county: It is strenuously insisted that the court erred in admitting these confessions in evidence, for that the same were not free and voluntary, but were extorted by coercion, torture, threats, and promises. The facts relied upon to establish the voluntary character of the confession are, in substance, as follows: The crime is said to have been committed on Sunday evening, January 23, 1898. Defendant was at that time 28 years of age, and had had considerable business and other experience. He was arrested Saturday, January 29th, at about 3 o'clock in the afternoon, and taken to the police station. There he was placed in a cell about 6x8 feet, which was devoid of furniture, and had nothing for a bed except two boards nailed together and supported at either end by cleats. Here he was kept until the alleged confession was made, some time about half past 4 o'clock the following Monday morning. About 10 o'clock Saturday evening he was taken to the office of the chief of police, and there examined by the mayor and other officers of the city regarding his whereabouts on the Sunday and Monday previous. The chief of police was absent from the city, and did not return until about 11:30 on Saturday evening. On his return he went immediately to his office, where defendant and others were. He (the chief) soon learned that defendant and some five others were arrested for the crime, and was told regarding the examination of the defendant by the mayor and others. During the night, Greiner, the chief of police, had all the suspects before him from time to time, and he examined and cross-examined the defendant regarding his whereabouts before, at the time of, and after the crime is said to have been committed. At the first or second examination defendant was thoroughly searched, and his undershirt was taken from him and kept for use as evidence. A pocket-knife was also taken from him, as we understand it, but this was not done until he made his confession. Sunday

forenoon the defendant was again brought into the presence of the chief of police, and again catechised regarding his whereabouts at different times at and about the time the crime is said to have been committed. As we understand it, he was brought before the chief of police twice Sunday morning, and about the same questions asked each time. Defendant was slow about answering, sometimes delaying for more than 15 minutes. Sunday afternoon defendant was again brought before the chief of police, and, after going through much the same process, the chief, about 4:30 o'clock in the evening, took the defendant to the morgue where the dead bodies of the victims of the murder were lying. He was handcuffed when he left the office, and so remained until he was returned to the jail. With the chief of police and defendant were two of the city aldermen. The morgue was about three blocks from the jail, and the bodies of the murdered women were lying in the second story of the building, which was used as a morgue. Defendant was taken past the bodies which were lying close to him, and no doubt all present closely scrutinized his manner and demeanor at the time. After the return from the morgue defendant was again taken to the chief's office, and kept there until about dark, when he was returned to his cell. As he was being conducted to his cell, he asked the chief to step to one side, and said he wanted to talk with him. He (the chief) responded that he had been talking with him "a whole lot," "and you are contradicting yourself, and if you will talk to me right I will talk to you." About 11 o'clock Sunday evening defendant was again taken before the chief of police, and remained in his room until 4:30 or 5 o'clock Monday morning. Shortly after coming before the chief the last time he asked him (the chief) why it would not be just as well to plead guilty or "say he was guilty." The chief said: "No; that the wanted to know if anyone else was implicated in the crime." Very much talk was indulged in from that time until the confes-

sion is said to have been made, very little of which is material, save that defendant asked to see an attorney, and said that if the attorney advised him to tell about the crime he would do it.    The chief said the attorney would be there Monday morning to see him.    The attorney had been there on Sunday, as we understand it, but was not allowed to have any private conversation with him (the defendant).    He did tell the defendant, however, that he (the attorney) had been employed to look after his (defendant's) interests. During the Sunday night interview the chief showed the defendant some old revolvers and other relics that he had in his office.    Shortly after making the remark regarding his attorneys, defendant grew sullen, and refused to talk.    The chief thereupon got up to go out of the room, and defendant him back.    In a short time the defendant made a confession regarding his connection with the affair, and gave all the details thereof.    The chief cross-examined him while the confession was being made, and at its conclusion sent for Mr. Clark, the county attorney.    The county attorney came as soon as he could after being called, and when he came the defendant was informed that he was the county attorney, and for him to make his statement, that it might be taken in writing.    Defendant gave an account of his whereabouts on the Sunday the crime is said to have been committed, but did not fully state all the matters he had related to the chief of police, and Mr. Clark arose, put on his overcoat, and started to leave, when defendant said, "Hold on; I will tell you all about it."    Shortly thereafter he made a full confession to Clark, which was taken down in writing, sworn to by defendant, and witnessed by two witnesses.    It is this confession, as well as the oral one made to the chief of police, which is claimed was involuntarily made.    The written confession was read over to defendant at least twice, and Clark asked him several times before he made it if it was his free and voluntary act, and if any promises or inducements were held out to him to induce him to

make it; to which he responded there were no inducements, and that it was his free and voluntary act. Something was said about defendant's attorney, and he was informed that his attorney would be there in the morning. There is a conflict in the evidence regarding defendant's condition the next morning, and, in view of this conflict, we cannot say there was anything in his after appearance indicating that the confession was involuntary.

Such in brief, is the testimony relating to the confession. The trial court heard it at first, the jury being excluded, and, finding that the confessions were *prima facie* admissible, directed the jury to be recalled, and all the evidence relating to the confession was read in its presence.

The question of law presented, and the only one for our consideration, relates to the admission of these confessions in evidence. It is evident there were no promises or other inducements held out to defendant to elicit a confession. His statements, oral and written, if not voluntary, were brought about through fear or torture, and it is with that question we have to deal. Confessions which are not voluntarily made, but are extorted through hope or fear caused by inducements held out to the prisoner, are not competent evidence against him. Whether confessions proposed to be introduced in evidence against a prisoner are of the character just indicated is a question to be determined by the court. *State v. Fidment,* 35 Iowa, 541. But where there is a conflict of evidence, and the court is left in doubt on the question, the inquiry should be left to the jury, with the direction to disregard and reject the confession, if, upon the whole evidence, they are satisfied that the confession was obtained through improper influences. *Com. v. Cuffee,* 108 Mass. 285; *People v. Howes,* 81 Mich. 396 (45 N. W. Rep., 961; *Burdge v. State,* 53 Ohio St. 512 (42 N. E. Rep., 594). Where the confession appears on its face to be free and voluntary, as the one made by the defendant in this case, the burden is on the defendant to show

that it is incompetent. *Rufer v. State,* 25 Ohio St. 464.  In the absence of such a showing, the weight of authority seems to be that, when there is a general objection that the confession was made under promises, threats, or fear, the burden is on the state to show that it was freely and voluntarily made. *Bradford v. State,* 104 Ala. 68 (16 South. Rep., 107); *People v. Rodriguez,* 10 Cal. 50.  Adjuration to tell the truth is not sufficient to justify the rejection of the confession. *Sparf v. U. S.,* 156 U. S. 51 (15 Sup. Ct. Rep., 273, 39 L. Ed. 343); *Com. v. Preece,* 140 Mass. 276 (5 N. E. Rep., 494); *King v. State,* 40 Ala. 314.  The fact that the confession was induced by artifice, deception, or fraud will not exclude. *People v. Barker,* 60 Mich. 279 (27 N. W. Rep. 539); *State v. Staley,* 14 Minn. 105 (Gil. 75); *Heldt v. State,* 20 Neb. 492 (30 N. W. Rep., 626).  Fear of ultimate consequences of the crime will not be sufficient. *Allen v. State,* 12 Ill. App. 190; *People v. Wentz,* 37 N. Y. 304. And the mere fact that the prisoner is in custody will not amount to undue influence or fear. *State v. McLaughlin,* 44 Iowa, 82; *Com. v. Preece, supra.*  That the prisoner was manacled had no bearing. *Hopt v. People,* 110 U. S. 574 (4 Sup. Ct. Rep., 202, 28 L. Ed. 262).  In *People v. Johnson,* 2 Wheeler, Cr. Cas. 261, it was held no valid objection that defendant had been called upon to touch the deceased's body.  But if the confession is obtained by any sort of threats or violence, or by any direct or implied promises, however slight, or by the exertion of any improper influence, it is inadmissible.  Inquisitorial proceedings, which, directly or indirectly, menace the life or safety of the prisoner, and are calculated to produce such a state of mind as that the answers given to the questions propounded are not free and voluntary, will not be tolerated.  But the showing must be such as to induce the belief that the statements were the result of an involuntary condition of mind.  As said by Fuller, C. J., in *Wilson v. U. S.* 162 U. S. 613 (16 Sup. Ct. Rep., 895, 40 L. Ed. 1090): "In short, the true test of admissibility is

that the confession is made freely, voluntarily, and without compulsion or inducement of any kind." The fact that the confession was made to a public officer while the accused was under arrest, in or out of prison, or was drawn out by his questions, does not necessarily render the confession involuntary; but, as one of the circumstances, such imprisonment may be taken into account in determining whether or not the statement of the prisoner was voluntary. *Hopt v. People, supra.*

We have already said that the confession in this case is presumed to have been voluntary, and that the defendant was called on to introduce enough evidence to rebut this presumption. It was the province of the judge to determine, as a preliminary question, whether the confessions were made with that degree of freedom to justify their admission in evidence, or, in case of doubt and of a conflict in the evidence, to submit the question to the jury, under proper instructions, and unless there was manifest error in admitting them in evidence, this court will not interfere. *Fife v. Com.* 29 Pa. St. 429. The matter rests peculiarly in the sound discretion of the trial judge, and, while his decision is subject to review, this court will not reverse on a question of fact, unless the finding is manifestly against the weight of the evidence. The trial court saw and heard the witnesses, and had better knowledge of the facts than we can possibly have; hence its conclusion will not be disturbed, unless clearly and manifestly erroneous. *State v. Staley,* 14 Minn. 110 (Gil. 75); *Bartley v. People,* 156 Ill. 228 (40 N. E. Rep. 831); *Com. v. Preece, supra; State v. Gorham,* 67 Vt. 367 (31 Atl. Rep. 845); *Fife v. Com.,* 29 Pa. St. 429; *People v. Wentz,* 37 N. Y. 305.

Now, in the case at bar no threats were made, and no promises or inducements held out. The fear, if any, under which defendant labored, arose from other causes than the conduct of the officers having him in charge. He was searched, his clothing removed, and his undershirt kept by the chief of police, but this was not unusual

or extraordinary. He was handcuffed, and taken in the presence of the dead bodies of the victims, but this would not produce fear in and a confession from an innocent man. When returned to the jail, he said to the chief of police that he wished to talk with him, and he was returned to the chief's office pursuant to this request. He was told by counsel that he had been employed to look after his interests, and, while counsel was not allowed to talk with him privately on Sunday afternoon, defendant was told that he could see him Monday morning, and at the time the written confession was made was again informed of that fact. He made no request to see counsel after being informed of these facts. When brought before the chief of police, Sunday evening, pursuant to his own request, he was not "browbeaten" or unduly questioned by that officer. The talk was general, and the firearms shown him were relics that were explained, and their history given. He was in no way threatened therewith. Much of the time while before the chief on Sunday evening defendant was smoking. He was questioned regarding his whereabouts, and, when he asked about pleading guilty, the chief said, "No; he wanted to know who else was with him." When the confession was made, there was no questioning. The prisoner gave a connected account of the entire transaction. When the county attorney came, he asked the defendant if his confession had been freely made, and if any inducements had been offered, and defendant said, "No." When the county attorney started to leave during a break in the confession, the prisoner called him back, and said, "I will tell you what I know." After making the written confession, he asked the county attorney if he could not make him some kind of a promise, and the county attorney said, "No." While making this confession, the defendant was not apparently excited, but sat smoking a cigar most of the time. He was advised by a fellow prisioner that the best way out was to plead guilty, and trust to the mercy of the court. The material parts of the confessions correspond with the proven facts,.

and, as defendant was not informed by any one as to what the evidence against him was, this should be regarded as a strong circumstance tending to show the truth of the statement, and that it was not manufactured out of fear, or by reason of the inquisitorial character of the proceedings.

In view of this record, and of the evidence on which the trial court acted in admitting the confessions, we are not prepeared to hold that it abused its discretion, or that the confessions were obtained in such a manner as that they should be excluded. All of the evidence was submitted to the jury under proper instructions, and the defendant had the benefit of the showing made. The case is not stronger in its facts than the following, where confessions were held voluntary: *Com. v. Cuffee,* 108 Mass. 287; *Com. v. Smith,* 119 Mass. 311; *Com. v. Preece, supra; Sparf v. U. S.,* 156 U. S. 52 (15 Sup. Ct. Rep. 273, 39 L. Ed. 243); *People v. Wentz, supra; Roesel v. State,* 62 N. J. Law, 227 (31 Atl. Rep. 408); *State v. Trusty,* 1 Penn. 319 (40 Atl. Rep. 766); *People v. Kennedy,* 159 N. Y. 346 (54 N. E. Rep. 51), which is a very strong case; *Com. v. Chance,* 174 Mass. 248 (54 N. E. Rep. 551). We will not take the space needed to quote from these cases in support of our holding. It is sufficient to say that they fully sustain the conclusion reached. In *Flagg v. People,* 40 Mich. 706, defendant was told by the officers having him in charge that the best thing he could do was to own up. Defendant in that case was weak-minded, and the officers also gave him some intoxicating liquor before he made his confession. In *State v. McCullum,* 18 Wash. 394 (51 Pac. Rep. 1044), defendant was placed in a dungeon and kept there for six days, and was taken out from time to time, and asked if he would confess. On his refusal to do so, he was returned. Finally he made the confession that was rejected. *Gallagher v. State,* 40 Tex. Cr. App. 296 (50 S. W. Rep. 388), also relied on by appellant, is based on a statute, and is easily distinguishable. *U. S. v. Bram,* 168 U. S. 532 (18 Sup. Ct. Rep. 183,

42. L. Ed. 568), is the strongest case cited by the appellant, and if the rule there announced were followed it would call for a reversal of this judgment. We do not regard the majority opinion as sound, and in this we are not alone. See *State v. Trusty* and *Roesel v. State, supra,* and Wigmore's notes to section 213, Greenleaf Evidence; also note 10 to section 219, Greenleaf Evidence. We prefer the dissenting opinion of Justice Brewer filed in that case. While there are other cases that would seem to call for a reversal of the judgment, the ones we have cited abundantly sustain our position, and seem to announce the more modern and more sensible rule. As said by Earl, J., in *Reg. v. Baldry,* 2 Denison & P. Cr. Cas. 430: "In many cases where confessions have been excluded, justice and common sense have been sacrificed, not at the shrine of mercy, but at the shrine of guilt." Courts have frequently gone to the extreme in their anxiety to protect the defendant's rights, unmindful of the fact that the peace and good order of society should also be protected. We do not think there was such an abuse of discretion in the trial court in admitting the confessions as to justify us in interfering.—AFFIRMED.