STATE OF IOWA, Appellee, v. LEO MIKESH, Appellant.

No. 44889.

NOVEMBER 21, 1939.

REHEARING DENIED MARCH 9, 1940.

F. J. McGreevy and George Mikesh, for appellant.

Fred Everett, Attorney General, Jens Grothe, Assistant Attorney General, Harvey J. Carter, County Attorney, W. C. Shepard, and George R. Blake, for appellee.

HALE, J.—The defendant was indicted for the crime of entering a bank with intent to hold up and rob, alleged to have been committed on the 20th day of December, 1938. In view of the gravity of the offense and the extent of the punishment, we set out the evidence at some length.

The village of Kesley is situated in Butler county, about 16 miles northeast of Ackley, which is on the line of Hardin county and the county north, Franklin. The county automobile license number of Hardin county is 42. In Kesley is located a branch office of the Iowa State Bank, whose main office is at Clarksville in the same county. This branch bank is on the north side of Main street, which runs east and west, on the northwest corner of the intersection of a north-and-south street. Across this north-and-south street to the east is the

Uhlenhopp Grocery. To the west on the north side of Main street is a creamery, and farther to the west, about 100 feet from the bank, is a garage. Across the street on its south side are other buildings.

On the afternoon of December 20, 1938, George De Buhr, one of the employees of the branch bank, was clerking at a sale in the country, leaving Tillie Johnson, the other employee, in charge. At about 4 o'clock the defendant, according to the testimony of Miss Johnson, who identified him, entered the bank, told her, "This is a holdup, hand over the cash," and slid a revolver through the window at the counter and told her to hurry. She then turned over to him silver and currency amounting to $53.80. After being informed that he could not get the currency in the vault immediately, he shut Miss Johnson in the vault, from which she released herself and gave the alarm. After the robber received the cash he put on some dark-colored glasses, but was at no time masked.

A witness who had seen him park his car on the north side of the street, between the bank and the garage, and then proceed toward the bank, and who identified him as the defendant, saw him about 10 minutes later get into his car and drive to the west on Main street. Another witness who also identified the defendant saw him driving west on Main street at about the same time. Witnesses described the car as an old-model Buick coupe, one stating it was a 1928 model, rather shabby, bluish green, with a canvas top. One of these witnesses also said it bore the county license number 42. Witnesses Korte and Harms, who testified that they saw the defendant in Kesley and later in the evening at Ackley, stated that defendant's car was the same one they had seen in Kesley; and another witness —Uhlenhopp, a farmer—also met the car. It was also identified by a witness, also named Uhlenhopp, as the car which passed the store where he worked in Kesley, going west, at about the time of the robbery. The car is also described by the service station operator as passing his station east of the bank, and as driven by a man with a light gray hat. The car as described by these witnesses was also seen, and described with varying degrees of accuracy, in Kesley, by others, at about the same time. Some nine other witnesses at different points on the road saw a car corresponding in general description to

defendant's, proceeding west and south toward Ackley, after 4 o'clock. They unite in describing it as greenish blue, some giving the make, and some more fully describing it. About 5 o'clock defendant was seen by two neighbors driving his car into his garage in the south part of Ackley. His family were out of town on a visit. He then went into his house, changed his clothes, and went to the home of a friend for dinner. He returned to his home about 9 o'clock; was met by officers and taken to the town hall and questioned. With the officers he returned to his home, and in answer to the sheriff's inquiry informed the officer where his revolver could be found. The sheriff found, on a shelf in a closet, a revolver and $80.63 in two purses. This revolver, according to the testimony of Miss Johnson, looked the same as the one held by the robber at the bank. Some of the currency was old-style large bills. The old bills were claimed by the defendant to have been kept as keepsakes; and all the currency was claimed to be his own.

The defendant's account of his movements during the day is that he left home at about 8:45 in the morning, went to the post office, then to an oil station where he bought some gasoline. He intended to go to a funeral, but did not. After leaving the filling station he went to a pool hall, which he left at 9:30, and drove to Aplington. He left there about 11:40 and drove to Dumont; stopped at a tavern kept by one Anthony, where he ate lunch, drank some beer, and played cards. He left Dumont about 3:50 and drove home to Ackley, put up his car, went in his house, changed his clothes, drove to his dinner engagement and remained at his friends' home until 9 o'clock, when he was arrested by the officers. He denies that he was at Kesley at any time on December 20, 1938.

That defendant was at Aplington at about the time he states is corroborated by the testimony. There is also evidence to support his statement that he was at Dumont. Several witnesses testified to defendant's presence in the tavern, but no one places the time of his departure as late as does defendant. One Freeze states defendant left at 3:30. Reed, another witness, states that when the witness left, shortly after 3 o'clock, defendant was still in the tavern. Kothenbrinck, a witness, testifies that when the witness left at 3:30 defendant was still there.

Defendant's wife and mother testified as to the ownership

of the money found in the house, and one witness testified as to a car similar to defendant's owned by one Faint, but on rebuttal Faint described his car as a Pontiac coupe, green, with black top.

The above comprises the substance of the testimony introduced.

I. Defendant contends that the court erred in admitting the written statement signed by defendant on December 21, 1938, at night. This differs little from his testimony on the witness stand, except as to the time of arriving at and leaving Dumont and arriving at his home. The time is, of course, important. This statement was made about 10 o'clock at night. No threats were made and no promises given, nor is it so claimed. The defendant was in custody, and there is no evidence that he was informed as to the use which would be made of this statement. So far as the evidence indicates, it was voluntary, and under the circumstances the burden was upon the defendant to show it incompetent. State v. Storms, 113 Iowa 385, 85 N. W. 610, 86 Am. St. Rep. 380; State v. Heinz, 223 Iowa 1241, 1253, 275 N. W. 10, 17. The signed paper was introduced on cross-examination, after the defendant had testified as to his movements on the 20th, and was offered for the purpose of impeachment. The general rule as to a caution or warning to a prisoner is set out in 16 C. J., sec. 1482, p. 723:

"In the absence of a statute requiring caution or warning, the fact that a voluntary confession was made without accused having been cautioned or warned that it might be used against him does not affect its admissibility."

There is no such statute in this state. This matter has been fully discussed in the case of State v. Beltz, 225 Iowa 155, 162, 279 N. W. 386, 390. There was no error in this respect.

II. Defendant also alleges error in the giving of the instruction relative to the defendant as a witness in his own behalf, in which the jury was informed that they had the right to take into consideration the fact that he was on trial and was an interested witness, and that they were not required to blindly receive the testimony given by him, but could consider whether it was true and given in good faith or false and for the purpose of avoiding conviction. They were also told that his testimony was not to be discredited solely because he was interested, but

that he had a right to testify in his own behalf and his testimony should be fairly and impartially considered, together with all the other facts and circumstances in the case, and weighed in the same manner and with the same fairness as that of other witnesses, and that they should give to his testimony and to that of all other witnesses the weight to which they believed it to be fairly entitled. Defendant frankly concedes that this instruction has been approved in this state. Practically the same instruction was approved in State v. Mecum, 95 Iowa 433, 64 N. W. 286. See, also, State v. Young, 104 Iowa 730, 74 N. W. 693; State v. Stuart, 190 Iowa, 476, 180 N. W. 186; State v. Moelchen, 53 Iowa 310, 5 N. W. 186; State v. Sterrett, 71 Iowa 386, 388, 32 N. W. 387; State v. Ryan, 113 Iowa 536, 85 N. W. 812; State v. Walker, 133 Iowa 489, 110 N. W. 925; State v. Steidley, 135 Iowa 512, 113 N. W. 333.

III. Defendant claims that the verdict is contrary to the evidence. In the motion for new trial he characterizes the conduct of the alleged robber as absurd, an apparent prank and effort to attract attention, or to throw the blame on someone else, "or if the defendant committed it, he must have been utterly lacking in reason and criminal responsibility." That the conduct of the defendant, as shown by the evidence, was not prudent or cautious is readily believable. This is true of most crimes of violence and of most criminals. But in the face of the evidence, which was ample to submit to the jury, including the identification both of defendant and his car, we are not disposed to hold that in any respect there was insufficient evidence to support the verdict.

IV. Other errors alleged in defendant's argument are misconduct of the prosecuting attorney, erroneous ruling on objections to testimony, and failure on the part of the State to prove that the place alleged to have been robbed was a bank. No misconduct of counsel is set out, merely a general statement. No statement, remarks, or specific misconduct is pointed out. We have carefully examined both the abstract and the transcript as to rulings on admission of testimony complained of by defendant, and find no error. There was also ample evidence as to the building being a bank, in addition to the direct evi-

dence of Miss Johnson that it was a branch office of the Iowa State Bank. That it was such was not disputed. See State v. Wagner, 202 Iowa 739, 210 N. W. 901.

V. An amendment to defendant's motion for new trial relates to the mental capacity of defendant. In support of the contention that he was lacking in mental capacity is an affidavit of a layman. Very few facts are given therein; the affidavit is merely a layman's conclusion, and the affiant's acquaintance with defendant was several years before the trial, and affiant speaks of only one recent interview, a week or 10 days prior to December 20, 1938. Nor was any issue of mental capacity raised on the trial. The danger of granting a new trial on such a showing is manifest.

VI. Defendant complains of the imposition of a life sentence, under the facts of the case. The matter was referred to by the presiding judge, who referred to the case of Cave, Keener v. Haynes, 221 Iowa 1207, 268 N. W. 39, and held that he was bound by our holding in that case. The holding in that case is that the trial court has no discretion in a conviction for this offense, but that life imprisonment is mandatory. The court could not do other than it did.

We have given careful consideration to all the matters presented by counsel and to the entire record in the case. It is important to the defendant and to the State. We hold that the defendant was fairly tried and we find no error in the record. The judgment is, therefore, affirmed.—Affirmed.

OLIVER, C. J., and HAMILTON, RICHARDS, STIGER, SAGER, BLISS, and MILLER, JJ., concur.