In re MORGAN.

Crim. No. 2231.

United States District Court
N. D. Iowa, C. D.

Nov. 12, 1948.

812

Robert L. Larson, Atty. Gen. of Iowa, Don Hise, First Asst. Atty. Gen., and Harvey Uhlenhopp, County Atty., Franklin County, of Hampton, Iowa, for the State of Iowa.

T. E. Diamond, U. S. Dist. Atty., and William B. Danforth, Asst. U. S. Dist. Atty., both of Sioux City, Iowa, for the United States.

GRAVEN, District Judge.

This is an application by the State of Iowa for the surrender of Bernard Delbert Morgan to the State of Iowa by the United States, involving the question as to which sovereign first acquired jurisdiction following the commission by Morgan of an offense punishable under the laws of both the State of Iowa and the United States.

On Saturday, September 25th, 1948, two men at the point of a gun held up and robbed the Sheffield Savings Bank of Sheffield, Iowa, of approximately $9,000 in cash. The Sheffield Savings Bank is a state bank. It is a member of the Federal Deposit Insurance Corporation. Sheffield, Iowa, is a town of approximately 1,000 inhabitants located in Franklin County, Iowa. It is in the Central Division of the United States District Court for the Northern District of Iowa. Franklin County adjoins Cerro Gordo County on the south. The county seat of Franklin County is Hampton and the county seat of Cerro Gordo County is Mason City. The two county seats are approximately thirty miles apart. The Town of Sheffield is in between these two county seats. It is a few miles closer to Hampton than it is to Mason City. The Iowa State Highway Patrol, a division of the Iowa Department of Public Safety, maintains an office at Mason City. Another division of that Department is the Division of Criminal Investigation and Bureau of Identification with headquarters at Des Moines. There is a resident agent of the Federal Bureau of Investigation and a resident United States Commissioner at Mason City. There is no Deputy United States Marshal stationed at Mason City.

There is a resident Deputy United States Marshal and a resident United States Commissioner at Fort Dodge in the same Division. The United States Commissioners at Mason City and Fort Dodge are the only United States Commissioners in the Central Division, and the Deputy United States Marshal at Fort Dodge is the only member of the United States Marshal's staff in the Central Division. Fort Dodge is approximately 100 miles from Mason City.

Immediately after the robbery, Harry O. Webb, the cashier of the Sheffield Savings Bank, notified the Franklin County Sheriff and the Mason City office of the Iowa State Highway Patrol. The latter office notified the resident agent of the Federal Bureau of Investigation. The Division of Criminal Investigation and Bureau of Identification of the Iowa Department of Public Safety was also notified. The resident agent of the Federal Bureau of Investigation at Mason City, William C. Hopkins, was joined shortly thereafter by Special Agents Dawson and Halla of the same Bureau. Those agents, together with Charles W. Nolte, Sheriff of Franklin County, Ralph Jones, Deputy Sheriff of Franklin County, Agent Max Studer of the Division of Criminal Investigation and Bureau of Identification, and State Highway Patrolman O. L. Evans, working in close cooperation, began an immediate search for the bank robbers. They spent Saturday afternoon and evening running down different clues without success. It was reported to them that an automobile of a certain color and make had been used in connection with the robbery. Sunday forenoon Deputy Sheriff Jones received information that Bernard Delbert Morgan had been seen driving an automobile similar to that used in the robbery. Soon thereafter Special Agents Hopkins, Dawson, and Halla came to the Franklin County Sheriff's office at Hampton. Deputy Sheriff Jones told them of the information he had received. Shortly thereafter Deputy Sheriff Jones, accompanied by Special Agent Hopkins, went to the Franklin County farm home of the parents of Morgan. Some time in the forepart of Sunday afternoon, Morgan came to Hampton. Deputy Sheriff Jones either noticed or was informed that Morgan's

car was parked on one of the streets of Hampton. The City Marshal of Hampton, who had come to the Sheriff's office, furnished the information that Morgan had relatives living in an apartment in Hampton and that possibly Morgan was visiting them. Special Agent Hopkins and the City Marshal then left and returned shortly thereafter accompanied by Morgan who had been located at the apartment of his relatives. Morgan had not been arrested and came to the Sheriff's office voluntarily. In the Sheriff's office at the time were Special Agents Hopkins, Dawson, and Halla, Deputy Sheriff Jones, and Patrolman Evans. Morgan was questioned in regard to his connection with the robbery and denied all connection with it. It was then suggested by the officers that Morgan go to Sheffield for the purpose of ascertaining whether the officers and employees of the bank could identify him as one of the robbers. Special Agents Hopkins and Halla, Patrolman Evans, and Morgan then got into the patrol car of Patrolman Evans and went to Sheffield. Special Agent Dawson and Deputy Sheriff Jones remained at the Sheriff's office. At Sheffield Special Agent Hopkins first went into the bank and had the officers, employees, and others present in the bank at the time of the robbery gather in the back room of the bank. Then Patrolman Evans and Special Agent Halla brought Morgan into the lobby of the bank. Those in the back room then came out one at a time and viewed Morgan. When that was completed, Special Agent Hopkins interviewed them as to identification. The cashier, Harry O. Webb, positively identified Morgan as one of the robbers, and several of the others partially identified him as such. Special Agent Hopkins then came out into the lobby of the bank where Morgan and the other officers were standing and told Morgan that he had been identified as one of the robbers and that he might as well admit his guilt. Morgan then stated, "I did it." Special Agent Hopkins then placed his hand on Morgan's shoulder and said, "Bernard, you're under arrest." At the time, no state or federal warrant had been issued for the arrest of Morgan. Special Agent Hopkins the made the re-

quest that Morgan be handcuffed. His request was addressed to both Special Agent Halla and Patrolman Evans. Patrolman Evans then produced handcuffs which he placed on Morgan. Morgan then stated that Robert Franklin Safford was the other participant in the robbery and that he lived at Mason City. The Sheriff's offices at Hampton and Mason City were then notified of the arrest of Morgan and that Safford, the other participant in the robbery, was yet to be apprehended. Special Agents Hopkins and Halla and Patrolman Evans then proceeded to Mason City with Morgan. Morgan, at some time prior to arriving in Mason City or some time thereafter, told the officers that the loot had been divided and buried. Upon arrival at Mason City, Morgan was taken to the Mason City municipal jail where plans were made for the apprehension of Safford. There was some uncertainty as to Safford's place of residence in Mason City. Special Agent Hopkins told those in charge of the municipal jail that he was not booking Morgan as he was taking Morgan along to indicate Safford's place of residence. Morgan was taken along and Safford was arrested as he drove up to the place of residence indicated by Morgan. It is not necessary to go into the details of the arrest of Safford as it was stipulated between counsel for the State of Iowa and counsel for the United States that the ruling on this application in regard to Morgan would be determinative as to Safford.

At Mason City there is both a municipal jail under the control and supervision of the Mason City Police Department located in the police station and a county jail under the control and supervision of the Sheriff of Cerro Gordo County. After the arrest of Safford, he and Morgan were taken to the county jail at the suggestion of Sheriff Cal Dwan of Cerro Gordo County. Up to this time there apparently had not been any extended questioning of Morgan and no questioning of Safford. The different officers with the prisoners in their charge then went over to the Sheriff's office in the Cerro Gordo County Courthouse. That Sheriff's office is separate from the jail, which is in an adjacent building. Special Agent Hopkins then

orally requested Walter Balek, Deputy Sheriff of Cerro Gordo County, and Patrolman Evans to put Morgan in the county jail to be held for the Federal Bureau of Investigation. Deputy Sheriff Balek and Patrolman Evans then took Morgan over and put him in the county jail. It was then shortly after 9:00 o'clock P. M., Sunday, September 26th. Safford was kept at the Sheriff's office for questioning. A short time later Safford was also put in the county jail under oral directions from Special Agent Hopkins. Special Agent Hopkins informed Sheriff Dwan that Morgan and Safford were to be held for the Federal Bureau of Investigation. Sheriff Dwan stated the he had not as yet made any entry in his jail calendar that Morgan and Safford were being held for the Federal Bureau of Investigation but would make such entry. The Sheriff's jail calendar which was put in evidence shows that Morgan and Safford were received as prisoners at 10:30 o'clock P. M. on Sunday, September 26th. Opposite the names of both Morgan and Safford in the jail calendar appears the entry, "Hold for F. B. I." The questioning of Morgan and Safford had not been completed at 10:30 o'clock P. M., nor had any of the loot been recovered. Sometime during that Sunday night, Special Agent Hopkins and Patrolman Evans went with Morgan back to Franklin County. Morgan showed them where the loot had been buried and it was dug up. After that Special Agent Hopkins and Patrolman Evans returned Morgan to the county jail. After the return of Morgan to the county jail, further questioning was conducted and statements were taken from Morgan and Safford. By the time the matters referred to had been completed, it was well toward early morning. Sometime during that night, Sheriff Nolte arrived at the Sheriff's office at Mason City. After the questioning and the taking of the statements had been completed on the early morning of Monday, September 27th, there was some conversation between Sheriff Nolte and Sheriff Dwan about taking Morgan and Safford to the Franklin County jail. Special Agent Hopkins, who was still present, stated that Morgan and Safford were not to be taken to the Franklin County jail as they were federal prisoners.

On Monday morning, September 27th, around 8:30 o'clock A. M., Nathan H. Levinson, the resident United States Commissioner at Mason City, telephoned the office of the United States District Attorney at Sioux City in regard to the cases of Morgan and Safford. Assistant United States District Attorney William B. Danforth answered the call and dictated over the telephone to the Commissioner's secretary a complaint charging Morgan and Safford with robbery of a bank whose deposits are insured by the Federal Deposit Insurance Corporation contrary to the provisions of Title 18, Section 2113 of the Revised United States Code Annotated relating to Crimes and Criminal Procedure. Either during the telephone conversation or shortly thereafter, Special Agent Hopkins came into Commissioner Levinson's office, and shortly thereafter he signed the written complaint which had been typed out by the Commissioner's secretary. Special Agent Hopkins then telephoned Deputy United States Marshal Albert Halbach stationed at Fort Dodge to come over to Mason City and serve the warrants on Morgan and Safford. The telephone call was received by Deputy United States Marshal Halbach around 10:00 o'clock A.M. and after making arrangements for a guard to go with him, he left for Mason City. He then obtained the warrants from Commissioner Levinson, which was around 1:30 o'clock P.M. At 11:00 o'clock A.M. that forenoon, Special Agent Hopkins called the Cerro Gordo County Sheriff's office on the telephone, and informed that office that federal warrants had issued for Morgan and Safford and that Deputy United States Marshal Halbach was on his way from Fort Dodge to execute them. On Monday forenoon of September 27th, at around 11:30 o'clock A.M., Sheriff Nolte filed a preliminary information before George D. Patterson, a Justice of the Peace in Franklin County, charging Morgan and Safford with the violation of Section 708.9, Code of Iowa 1946, relating to bank robbery. That Justice then issued warrants for the arrest of Morgan and Safford. Sheriff Nolte went to the Sheriff's office at Mason City with

the warrants, arriving there early in the afternoon. He exhibited the warrants to Sheriff Dwan and requested that Morgan and Safford be turned over to him under the warrants. Sheriff Dwan told him he would have to wait. Sheriff Nolte then left the warrants with Sheriff Dwan and returned to Hampton. A short time thereafter, Deputy United States Marshal Halbach arrived at the Sheriff's office at Mason City. He identified himself to Sheriff Dwan, exhibited the warrants issued by Commissioner Levinson, and requested access to Morgan and Safford for the purpose of taking them before the Commissioner under the warrants. Sheriff Dwan refused him access to the prisoners. Deputy United States Marshal Halbach remained in Mason City and on the next day, September 28th, again requested access to Morgan and Safford for the purpose of executing the warrants held by him. Sheriff Dwan again denied his request. On Tuesday afternoon, September 28th, Sheriff Dwan turned Morgan and Safford over to Sheriff Nolte under the warrants held by that Sheriff. The entry in the jail calendar opposite the name of both Morgan and Safford under the date of September 28th reads, "Released to Franklin County." The conflicting demands of the Franklin County authorities and the federal authorities for Morgan and Safford had placed Sheriff Dwan in a very difficult and troublesome position. He released the prisoners to the Franklin County authorities only after being advised by an Assistant Attorney General of the State of Iowa and the County Attorney of Cerro Gordo that the Franklin County authorities had superior rights to their custody. Sheriff Nolte took Morgan and Safford to the Franklin County Jail, and on Wednesday, September 29th, they were brought before Justice of the Peace Patterson who bound them over to the Franklin County Grand Jury. Bail was fixed in the amount of $15,000. Safford was unable to furnish bail and is still in the Franklin County jail. Morgan furnished the required bond on October 11th and was released on bail. By direction of the United States District Attorney, Deputy United States Marshal Halbach on October 16th arrested Morgan under warrant issued by Commissioner Levinson and placed him in the Humboldt County jail. Morgan is being held in that jail as a federal prisoner.

The offense committed by Morgan is a crime under Section 708.9, Code of Iowa 1946, entitled "Entering bank with intent to rob." The penalty for conviction under this section of the Iowa Code is mandatory life imprisonment. State v. Mikesh, 1939, 227 Iowa 640, 288 N.W. 606. Such offense is a felony under Section 687.2, Code of Iowa 1946, which provides: "A felony is a public offense which may be punished with death, or which is, or in the discretion of the court may be, punished by imprisonment in the penitentiary or men's reformatory." The offense committed is also a crime under Section 2113 of Title 18 of the United States Code Annotated entitled "Bank robbery and incidental crimes," since the Sheffield Savings Bank is a member of the Federal Deposit Insurance Corporation. The penalty for conviction under this section of Title 18 of the United States Code Annotated is a fine of not more than $10,000, or imprisonment for not more than twenty-five years, or both. 18 U.S.C.A. § 2113(d). Such offense is a felony under Section 1 of Title 18 of the United States Code Annotated, which provides: "Any offense punishable by death or imprisonment for a term exceeding one year is a felony."

It is a general principle of law that when either the state or the federal government takes jurisdiction of a subject matter, whether it is person or property, civil or criminal, the sovereignty first taking jurisdiction retains it to the exclusion of the other until it has fully performed its duty and exhausted its jurisdiction. Ponzi v. Fessenden, 1922, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607, 22 A.L.R. 879; Wall v. Hudspeth, 10 Cir., 1940, 108 F.2d 865; Zerbst, Warden v. McPike, 5 Cir., 1938, 97 F.2d 253; Callahan v. United States, 8 Cir., 1912, 195 F. 924. The rule in criminal cases is well stated in Wall v. Hudspeth, supra, at page 866 of 108 F.2d: "When the court of one sovereign takes a person into its custody on a criminal charge he remains in the jurisdiction of that sovereign until it has been exhausted, to the exclusion of the courts of the other sovereign. That rule

rests upon principles of comity, and it exists between federal and state courts." Consequently, the decision in this case as to which sovereign first acquired jurisdiction of Morgan will determine which, to the total exclusion of the other, can retain custody of him until it has completely exhausted its jurisdiction by acquittal or conviction and service of sentence. This rule, however, exists only between the two sovereigns, the accused having no right to raise the question. Ponzi v. Fessenden, 1922, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607, 22 A.L.R. 879; Banks v. O'Grady, 8 Cir., 1940, 113 F.2d 926.

■ The crime charged against Morgan by the State of Iowa is a separate and distinct crime from that charged against him by the United States. The conviction or acquittal of Morgan on the state charge would not absolve or exonerate him on the federal charge, or vice versa. He is subject to punishment, in the event of conviction, on both charges. The question involved in the present case is as to which sovereignty shall have priority in disposing of its charges against him, and which sovereignty shall have priority in the infliction of punishment in the event of conviction.

The determination of the question of jurisdiction requires a consideration of a number of rules of law applicable to arrest and proceedings in connection therewith, and to the jailing of those charged with offenses against the United States. The latter phase will be first considered.

The United States has never established jails in the several states in which to confine or detain persons it has lawfully taken into custody. To provide for the safekeeping of such persons, Congress, in its first session in 1789, adopted a resolution requesting the several state legislatures to pass laws making it the duty of the keepers of their jails to receive and safekeep therein all persons committed under authority of the United States until lawfully discharged by such authority. 1 Stat. 96. And by further resolution in 1791 Congress directed that in case any state did not comply with the resolution of 1789 the marshals in such state be authorized to hire a convenient place to serve as a temporary jail in which to confine or detain such persons. 1 Stat. 225. Iowa, very early in its statehood, enacted the following provision, Sec. 3103 of the Code of 1851, now Sec. 356.1, Code of 1946:

"The jails in the several counties in the state shall be in charge of the respective sheriffs and used as prisons:

"1. For the detention of persons charged with an offense and committed for trial or examination.

"2. For the detention of persons who may be committed to secure their attendance as witnesses on the trial of a criminal cause.

"3. For the confinement of persons under sentence, upon conviction for any offense, and of all other persons committed for any cause authorized by law.

"The provisions of this section extend to persons detained or committed by authority of the courts of the United States as well as of this state."

Sec. 356.15, Code of 1946, Sec. 3116 of the Code of 1851, provides: "All charges and expenses for the safekeeping and maintenance of prisoners shall be allowed by the board of supervisors, except those committed or detained by the authority of the courts of the United States, in which cases the United States must pay such expenses to the county."

■ Under present statutory provisions of the United States, the Director of the Bureau of Prisons is, "For the purpose of providing suitable quarters for the safekeeping, care, and subsistence of all persons held under authority of any enactment of Congress," authorized to "contract, for a period not exceeding three years, with the proper authorities of any State, Territory, or political subdivision thereof, for the imprisonment, subsistence, care, and proper employment of such persons." 18 U.S.C.A. § 4002. In accord with this provision, the Director has contracted for and approved the use of six county jails in Iowa by the United States. The Court takes judicial notice that these six are: the Black Hawk County jail at Waterloo. the Floyd County jail at Charles City, the Humboldt County jail at Dakota City, the Linn County jail at Cedar Rapids, the Woodbury County jail at Sioux City,

and the Dubuque County jail at Dubuque. The Court also takes judicial notice, however, that orders and directives of the Director of the Bureau of Prisons provide that in case of necessity an unapproved jail may be used temporarily by the United States for the confinement of persons taken into its custody. In such cases the United States will pay the reasonable value of the use of such jail for such confinement.

■ When a federal prisoner is placed in the custody of a state jailor, such jailor becomes, so far as the detention and treatment of that prisoner is concerned, a federal jailor or keeper. Randolph v. Donaldson, 1815, 9 Cranch 76, 3 L.Ed. 662; Wilson v. United States, 8 Cir., 1928, 26 F.2d 215; United States v. Hoffman, D.C.Ill., 1925, 13 F.2d 269; Ex parte Shores, D.C. Iowa, 1912, 195 F. 627; In re Birdsong, D.C.Ga., 1889, 39 F. 599, 4 L.R.A. 628; United States v. Martin, D.C.Or., 1883, 17 F. 150. The United States Supreme Court in Randolph v. Donaldson, 9 Cranch at page 86, said: "For certain purposes, and to certain intents, the state jail lawfully used by the United States, may be deemed to be the jail of the United States, and that keeper to be keeper of the United States." In Ex parte Shores, supra, the Court for this District held the Sheriff of Black Hawk County guilty of contempt of Court for allowing a federal prisoner to leave the county jail. That Court said, 195 F. at page 630: "The said jails therefore, may be deemed jails of the United States for this purpose, and the keepers thereof, though not strictly officers of the United States, are keepers for the United States of the prisoners committed to said jails by the courts of the United States, and are subject to punishment for contempt for disobedience or disregard of the warrants or orders committing such prisoners to their custody."

■ In the present case it is not necessary to determine whether under the applicable Iowa statutory provisions a county sheriff is under a mandatory duty to receive into the county jail under his charge those held to answer federal charges where the jail in question has not been approved by the Director of the Federal Bureau of Prisons of the United States and there is no contract between such Director and the sheriff for the care of federal prisoners. It clearly appears in this case that Cerro Gordo County Sheriff Dwan did accept and receive Morgan from Special Agent Hopkins as a federal prisoner.

Having accepted and received Morgan as a federal prisoner, Sheriff Dwan became responsible for him to the Federal Court for this District. He would, however, be excused from such responsibility if under the verities of the situation Morgan did not have the legal status of a federal prisoner at the time he accepted and received him. If Morgan did have the legal status of a federal prisoner at the time he was accepted and received by Sheriff Dwan but subsequently during his confinement lost that status, then Sheriff Dwan would be excused from further responsibility to the Federal Court for him.

It is the contention of the State of Iowa that Morgan did not have the legal status of a federal prisoner at the time he was received into the Cerro Gordo County jail. The State of Iowa further contends that if Morgan did have the legal status of a federal prisoner at the time he was received into the county jail, that such status was subsequently lost or divested. It is the contention of the United States that at all times after Special Agent Hopkins informed Morgan he was under arrest in the lobby of the Sheffield Savings Bank, that Morgan had the legal status of a federal prisoner and that that status has never been lost or divested.

Those contentions bring up the second phase of this case, that of the applicable rules of law relating to arrest and matters in connection therewith. Federal statutes relating to crimes and criminal procedure and the Federal Rules of Criminal Procedure, 18 U.S.C.A., do not specifically define the word "arrest" or the requirements of an arrest. The United States has recently held that, in absence of an applicable federal statute, the validity of an arrest for a federal offense is to be determined by the law of the state where the arrest takes place. United States v. Di Re, 1947, 332 U.S. 581, 68 S.Ct. 222,

226. Sections 755.1 and 755.2, Code of Iowa 1946 provide as follows:

"755.1 Arrest is the taking of a person into custody when and in the manner authorized by law, and may be made at any time of any day or night."

"755.2 An arrest is made by an actual restraint of the person to be arrested, or by his submission to the custody of the person making the arrest. No unnecessary force or violence shall be used in making the same, and the person arrested shall not be subjected to any greater restraint than is necessary for his detention."

While the Iowa statutes make provision for arrests without warrant, Secs. 755.3, 755.4, and 755.5, Code of 1946, yet there is an applicable federal statute relating to arrests without warrant by agents of the Federal Bureau of Investigation. That statute is 18 U.S.C.A. § 3052, which provides that agents of the Federal Bureau of Investigation are authorized to make arrests without warrant "where the person making the arrest has reasonable grounds to believe that the person arrested is guilty of such felony and there is a likelihood of his escaping before a warrant can be obtained for his arrest." The first requirement of that statute is that the agent making the arrest must have reasonable grounds for believing that the person arrested is guilty of a felony. In the present case, it is undisputed that the robbing of the bank constituted a felony under the federal law and that Morgan had committed that felony. The identification of Morgan by the officers and employees of the bank and the admission made by Morgan to Special Agent Hopkins in the lobby of the bank that he had participated in the robbery certainly gave Special Agent Hopkins reasonable grounds for believing that Morgan was guilty of the felony of bank robbery. The second requirement of that statute is that "there is a likelihood of his escaping before a warrant can be obtained for his arrest." At the time Morgan admitted his participation in the robbery, it was late Sunday afternoon. An agent of the Federal Bureau of Investigation who would allow one who had just been implicated in an armed robbery to go loose while that agent went to a city or cities some distance away to locate a United States Commissioner and secure a warrant would undoubtedly be subjected to severe criticism and possible discipline. It seems clear that the situation was such that Special Agent Hopkins did believe and was justified in believing that there was likelihood of Morgan escaping before a warrant for his arrest could be obtained.

The acts done by Special Agent Hopkins in the lobby of the bank fulfilled the requirements of an arrest both under Sections 755.1 and 755.2, Code of Iowa 1946 and under the general rule of law. In an excellent article entitled "The Law of Arrest," 25 Iowa Law Review 201, Professor Rollin M. Perkins states at page 206 the general rule in regard to the requirements of an arrest as follows: "Mere words will not constitute an arrest, while, on the other hand, no actual, physical touching is essential. The apparent inconsistency in the two parts of this statement is explained by the fact that an assertion of authority and purpose to arrest followed by submission of the arrestee constitutes an arrest. There can be no arrest without either touching or submission." The Iowa law is in accord. Hobbs v. Illinois Central R. Co., 1917, 182 Iowa 316, 165 N.W. 912.

At the time of the arrest of Morgan in the lobby of the bank, there were present three officers of the law, Special Agents Hopkins and Halla representing the United States and Patrolman Evans representing the State of Iowa. Patrolman Evans, in testifying as a witness at the hearing in this case, disclaimed that he made any arrest of Morgan. Since Patrolman Evans was the only state officer present at the time in the lobby of the bank, it is apparent that the only arrest there made was made by Special Agent Hopkins representing the United States.

This presents the question as to whether the jurisdiction of the United States attached to Morgan at that time. The answer to this question depends upon what object and purpose is to be served by an arrest. In the Restatement of Torts, Section 112, the object and purpose of

arrest is stated as follows: "An arrest is the taking of another into the custody of the actor for the actual or purported purpose of bringing the other before a court, or of otherwise securing the administration of the law." An arrest lacking such object or purpose would be a wrongful arrest. Restatement, Torts, Sec. 127. An arrest is not to be considered as being something that exists in a legal vacuum. An arrest of a person upon the ground that he is guilty of an offense interdicted by statute is the first step in, and an integral part of, the process of bringing such person before the court or courts of that sovereignty whose statute has been violated. When an arrest has been made for such object or purpose, the jurisdiction of the particular court is then invoked.

For reasons of public security arrests without warrant are permitted. The right to make such arrests is much more circumscribed and the procedure thereafter is more immediate in character than it is in the case of arrests with warrant. However, where the situation presents a proper case for an arrest without warrant and the proper procedure is followed, the person making such arrest invokes the jurisdiction of the courts of the particular sovereignty whose statute has been violated as effectively as though the arrest had been made with a warrant. There is no support in the authorities for the view that the jurisdiction of the courts of a sovereignty whose statute has been violated can be invoked only by a written warrant of arrest.

▇▇▇ It seems clear that the arrest of Morgan by Special Agent Hopkins in the lobby of the bank had for its object and purpose the bringing of Morgan before the courts of the United States for violation of a statute of that sovereignty. It also seems clear that jurisdiction of the United States over Morgan was invoked and attached at the time of the arrest of Morgan in the lobby of the bank at Sheffield. However, it has been heretofore noted that jurisdiction over the person of an accused may be waived, lost, or divested. Jurisdiction over an accused may be waived by a sovereignty having such jurisdiction in favor of another sovereignty. It is not necessary to determine whether a special agent of the Federal Bureau of Investigation has the authority to waive jurisdiction of the United States in favor of another sovereignty, for in this case Special Agent Hopkins at no time took any other position than that Morgan was a federal prisoner at all times subsequent to his arrest in the bank.

▇▇▇ Rule 5 of the Federal Rules of Criminal Procedure provides that when an arrest without warrant is made, the person so arrested shall be taken before the nearest available commissioner or before any other officer empowered to commit persons charged with federal offenses "without unnecessary delay." This rule superseded the last clause of the section, which, prior to June 25th, 1948, was known as 5 U.S.C. A. § 300a, which provided that persons arrested by agents of the Federal Bureau of Investigation be "immediately taken before a committing officer." See Reviser's notes to Rule 5. The provisions of 5 U.S. C.A. § 300a were repealed by the Act of June 25th, 1948, enacting the New Title 18 U.S. Code, Crimes and Criminal Procedure. The former provisions of 5 U.S. C.A. § 300a are now incorporated in Secs. 3052 and 3107 of New Title 18 U.S.C.A. The provision superseded by Rule 5 of the Federal Rules of Criminal Procedure was omitted in the Revised Criminal Code. See Reviser's note to Sec. 3052 of New Title 18. It would seem that what constitutes an "unreasonable delay" in bringing one who has been arrested before a committing officer depends upon the facts and circumstances in the particular case. In this case, Morgan was lodged in jail on a Sunday evening. The federal complaint was filed against him the first thing Monday morning and arrangements were made to have him brought before the United States Commissioner as soon as possible thereafter. Such arrangements could not be carried out because of the developments heretofore referred to. It is the view of the Court that had not the federal authorities been so interfered with the requirements of Rule 5 would have been met.

▇▇▇ It is the holding of the Court that the United States was the first sovereign

820

to acquire jurisdiction, that such jurisdiction has never been waived, lost, or divested, and that the United States is entitled to the exclusive custody of Morgan until its jurisdiction is exhausted.

Judgment will be entered in accordance with this opinion.